JOHN T. STODDERT, ROBERT BOWIE, and ELIZA-BETH, his wife, *vs.* WM. H. TUCK, Exc'r of R. W. BOWIE, and others.

Upon an application for the specific performance of an unexecuted agreement, the complainant must prove not only that the agreement was made, but must also so clearly and fully show *its terms,* as that the court can have no difficulty in knowing what they are.

Letters are good marriage contracts, provided they sufficiently furnish the terms of the agreement, and contain not only an express promise, but the nature and extent of it.

Promises and agreements in consideration of marriage, in order to be binding, must be certain, positive and unqualified.

Where part performance is relied upon there must be clear proof of the contract, and the acts of part performance must be of the *identical* contract set up.

Every agreement to be specifically executed must be fair, just, reasonable, *bona fide,* mutual, and *certain in all its parts,* and if any of these ingredients are wanting, equity will not decree a specific performance.

This court will not enforce contracts depending upon parol testimony and part performance, unless the existence of the contract, its terms, and the acts in part performance, are sustained by clear and satisfactory proof.

APPEAL from the Court of Chancery.

The bill in this case was filed on the 16th of June 1848, by the appellants against the executors, widow and heirs at law of R. W. Bowie, to enforce the specific performance of an ante-nuptial agreement alleged to have been made between Stoddert and Bowie, in consideration of the contemplated marriage of Robert, the son of the latter, with Elizabeth, the daughter of the former.

19

The bill in substance alleges, that said Robert and Eliza-beth had no means of support independent of their parents, and a conference was consequently had between Stoddert and Bowie, which resulted in an agreement between them, that the former would purchase for his daughter a farm, at a cost not to exceed $12,000, and the latter would give his son, as soon as he was married, $8000 or $10,000 in personal pro-perty, suitable for the occupation and cultivation of a farm, and if the married couple should settle near him, would fur-nish them groceries and other necessary supplies for a year or more, until a crop was made, to obviate the necessity of their going in debt; that upon the faith of this agreement, and relying thereon, the parties were married on the 28th of May 1846, with the full concurrence of their said parents. That Stoddert, in performance of his part of this agreement, purchased for his daughter the "Nottingham Farm," at a cost of $10,550, and put the married couple in possession thereof under said agreement, and made a further advance to them of $1450 in personal property, making in all the $12,000 which, by the agreement, he had undertaken to furnish, but that he has not executed any deed of the farm to his daughter, and while he is quite willing to do so at a proper time, and is ready and offers to submit to a decree in this cause to that effect, he insists that there must be a cotemporaneous execu-tion by Bowie of his part of said agreement.

The bill further charges, that the selection of the "Notting-ham Farm" as the one to be purchased by Stoddert under said agreement, was not only with the concurrence, but at the suggestion of Bowie, made on the eve of the marriage, but not consummated till after it, and was in fact owned by Bowie, near his own plantation, and chosen by him partly on that account, and was sold by him to Stoddert for the resi-dence of the married couple, the house thereon being fitted up with as much furniture as he thought the married couple would need, and the farm being supplied to some extent with farming utensils; that Bowie also, prior to the marriage, put some slaves upon the farm, and after that event purchased and

delivered to his son another slave. That all this furniture and other property was so put upon the farm by Bowie in part performance of the aforesaid agreement, but some months after the marriage he carried away and sold for his own use part of said slaves, and his executor has since his death replevied the others, and claims them as a part of Bowie's estate. That shortly before his death Bowie admitted that the claim of the married couple was just and ought to be paid, but died on the 7th of January 1848, without having executed his said contract further than above stated, leaving a will, which is exhibited with the bill; that the personal estate, and the real estate devised for the payment of debts, are inadequate for that purpose, and that the same ought to be applied, as far as it will go, to the payment of the claim set up in the bill, and of the other debts of the testator, and any deficiency supplied by a sale of the residue of the real estate, or of so much thereof as may be necessary. The prayer is for a decree for a specific execution of the said agreement, for a sale of the said real estate to carry the same into effect, and for general relief.

The answers of the defendants do not admit that any such contract was ever made, and in addition plead and rely upon the statute of frauds in bar of any relief prayed by the bill.

The evidence, both written and oral, in support of the alleged agreement, is fully stated in the opinion of this court. To the testimony of *Thomas F. Bowie* objections were filed by the defendants at the hearing before the judge below, chiefly upon the ground that the matters detailed by him were made known to him professionally. The record also contains various assignments by R. Bowie, Jr., of his interest in the claim sought to be recovered in the case. William H. Tuck, the executor of R. W. Bowie, and one of the defendants, was examined by the complainants, and proved that the personal estate, and the lands devised by the testator for the payment of his debts, were inadequate for that purpose. The deed for the "Nottingham Farm" from Bowie and wife to Stoddert, is dated the 30th of November 1846, and conveys

the farm to Stoddert in fee for the consideration of $10,400
The inventory of the personal estate returned by the executor
amounted to $27,344.48, whilst the list of debts and claims
against the deceased amounted to over $100,000. There is
no evidence in the record showing the value of his real estate.
The record in the replevin case of *Bowie's Exc'r, vs. Bowie,*
reported in 1 *Md. Rep.*, 87, was filed in the cause by the
complainants. It was admitted by an agreement, that all the
real estate of Bowie has been sold since the filing of the bill
in this case, under a decree upon a creditor's bill in chancery.

The cause was submitted by the certificate of the chancellor,
(he being interested in the result of the suit,) to the *Hon.
Nicholas Brewer,* an associate judge of the third judicial
district, who passed an order dismissing the bill with costs.
His opinion, accompanying this order, is reported in the case
of *Stoddert vs. Bowie, et al.,* in 4 *Md. Ch. Decisions.* The
complainants appealed.

The cause was argued before LE GRAND, C. J., ECCLE-
STON and MASON, J.

*Charles H. Key* and *J. Mason Campbell* for the appellants.

1st. The only inquiry in this case is as to the validity of the
claim set up by the bill. Was there a *contract,* and such an
one as the bill states? Bowie never *denied* that he made
such a contract, neither does his executor, nor do the heirs
at law. They *knew* their dead father *had* made it. The
parents of the parties about to be married refused to allow
the engagement to go on without a contract; it was an *indis-
pensable prerequisite* to the marriage. We start then in our
search for the contract with a violent presumption in favor of
its existence, and the evidence fully sustains us. Mr. Bowie's
letters alone, coupled with the deed for the farm, are abundant
to prove it, without any resort to parol evidence. His first
letter to Stoddert says: you are ready to furnish land; I can
give the means to work it to the extent of $8000 or $10,000.
Who can doubt that these words express willingness as well

as ability? The next letter proposes a meeting, which he says must result in a settlement, and the last letter, referring to that meeting, shows that both parties were actually executing the contract then agreed upon; and the deed to Stoddert, while establishing his performance of his part, likewise establishes the terms of the contract to be the very same with those mentioned in Mr. Bowie's first letter. All these letters assume that there was an agreement, and the only question left open was, what *particular farm* was to be purchased? That and its *value* was settled by the parties at their interview in Washington. That these letters amount to an agreement, signed by the party to be charged within the fourth section of the statute of frauds, see 3 *Ves. and Bea.*, 187, *Western vs. Russell.* 3 *Merivale*, 447, *Kennedy vs. Lee.* 4 *Ves.*, 514, *Luders vs. Anstey.* 3 *Beavans*, 469. *McQueen on Husband and Wife*, 240, (66 *Law Lib.*, 56.)

2nd. Passing from the letters and deed, and looking on the contract as one wholly in parol, or partly in parol and partly written, the evidence is of the strongest kind to show what the contract was, and its part performance by Mr. Bowie, as well as full performance by the other parties. Upon the very testimony contained in this record in regard to the admissions of Mr. Bowie upon the subject of the contract, and his acts in pursuance of it, this court has, even at law, affirmed the title to the negroes put by Mr. Bowie on the "Nottingham Farm" to have passed out of him under the contract. 1 *Md. Rep.*, 87, *Tuck, Exc'r of Bowie, vs. Bowie.* See also 11 *G. & J.*, 323, *Moale vs. Buchanan.* 3 *Gill*, 138, *Dugan vs. Gittings.* 1 *Gill*, 389, *Hall and Wife, vs. Hall, et al.* It is not necessary to allege that the agreement was in writing or by parol. 1 *Chitty's Pl.*, 303. And it makes no difference that the evidence is partly in writing and partly in *parol.* As to the objections to the evidence of *Thomas F. Bowie*, we insist, the statements of Mr. R. W. Bowie on the subject of the terms of the contract, and his part performance of it, were not made to the witness professionally, there being no evidence in the record that he was a

professional man, but in the character of a friend consulted for advice, in which case they are admissible, even supposing the witness to be a professional man.  1 *Caine's Rep.*, 157, *Hoffman vs. Smith.*  The attorney may demur to answering, but if he consents to be examined his depositions are admissible.  1 *Ves., Sen.*, 63, *Maddox vs. Maddox.*  2 *Ves., Sen.*, 447, *Bishop of Winchester vs. Fourrier.*  His evidence is admissible in any case, unless the client objects that he has made the disclosure to him in confidence, and where the counsel consents to be examined his consent is the consent of his client.  3 *Philips' Ev., page* 281.  In this case the evidence was given without objection by the witness or any one else, and the objection was not properly taken.  2 *Md. Ch. Decisions*, 242, *Chew vs. Farmers Bank.*

3rd.  The terms of the contract having been fulfilled on his part by Stoddert, he is entitled to performance on the other side, even if he stood alone in the suit, but the case is much stronger when the married couple are united with him, it being in proof that they were unable to support themselves in the married state, and would not have contracted marriage but for the assurance given them by Bowie as well as Stoddert, the non-performance by Bowie of his engagement being in effect a fraud on them.  1 *Ves., Jr.*, 199, *Dundas vs. Dutens.* 1 *Md. Rep.*, 87.  The married couple could, upon the ground of possession under the agreement, ask a specific performance from Stoddert and his heirs; the latter is merely a trustee of the legal title for their benefit.  If the contract is partly in writing and partly in parol, we must look to see whether there has been a part performance.  Marriage itself is a part performance, for the parties married *upon the faith of the agreement;* possession under the contract is enough.  Bowie admits that he supplied the negroes and personal property in *part performance* of the contract.  What more is wanted than this?  The extent of part performance is not material.

4th.  The contract was good, no matter what Mr. Bowie's pecuniary circumstances were at the time, his contract not being *voluntary* with either Stoddert or the marrying parties,

but on a valuable consideration moving from the other side, viz: *land* as regarded Stoddert and marriage as regards the others. 1 *Johns. Ch. Rep.*, 272, *Sterry vs. Arden.* 3 *Gill*, 156, *Dugan vs. Gittings.* *McQueen on Husband and Wife*, 235, (66 *Law Lib.*, 52.) 11 *Leigh*, 136, *Huston vs. Cantril.* But there is no evidence that Bowie was insolvent at the time he made the contract, and the answers do not set up the defence that creditors would be defrauded.

5th. Even were it otherwise, neither the executors nor the heirs of Bowie can avoid his contract on this ground, even if they had made the necessary averments in their answer, which has not been done. 16 *Johns. Rep.*, 192, *Jackson vs. Garnsey.* 7 *G. & J.*, 108, *Allein vs. Sharp.* 6 *H. & J.*, 61, *Dorsey vs. Smithson.* 1 *Md. Rep.*, 87.

6th. The examination of the executor of Mr. Bowie to prove the insufficiency of the personal estate, cannot affect the complainants' right to a decree, no objection having been taken to the sufficiency of the bill after his examination, and even if it had been, the rule does not apply to an administrator, or to a party not interested in that to which he testifies. 5 *Paige*, 637, *Bradley vs. Root.* *Daniel's Ch. Pr.*, 268. The personal estate is not surety for the real estate.

*Thos. G. Pratt* and *Thos. S. Alexander* for the appellees.

1st. The record shows that there was no contract either written or oral anterior to the marriage. In 1 *Md. Rep.*, 87, there was a contract positively *proved* by the testimony of Stoddert, and that case, therefore, is not to be regarded in the argument of this. What is a contract? A mere proposition to do something does not make a contract. Propositions to be binding must be *positive, definite* and *unqualified*, and the agreement must be a *concluded* one. 1 *Bland*, 288, 289, *Ogden vs. Ogden.* 12 *Ves.*, 67, 73, 74, *Randall vs. Morgan.* 66 *Law Lib.*, 54. 1 *Keen*, 769, *Earl of Glengall vs. Barnard.* 2 *Ves. & Bea.*, 341, *Stratford vs. Bosworth.*

The marriage was solemnised on the 28th of May 1836, and Dr. Macubbin proves that the farm was *then* in possession

of R. W. Bowie, and was *afterwards* sold by him to Stoddert. The farm then could not constitute the consideration of an agreement concluded *before* the marriage. A few days *after* the marriage Bowie was urging the purchase of the farm, and this is inconsistent with the hypothesis of a previously existing *concluded* contract, and conclusively shows that up to *that time* there was none such. The testimony of Thos. F. Bowie does not fix the contract *anterior* to the marriage. But his testimony is excepted to and is inadmissible. He appears *as counsel* in the replevin suit, which is made part of the evidence here by the complainants themselves. There was no one present at the time his proof was taken to interpose the objection, and the practice is uniform to make the exception afterwards. 2 *Daniel's Ch. Pr.*, 1126. Robert Bowie does not prove that there was any contract. Mr. Johnson only proves that there was some difficulty in the way of the marriage about which the parties were to meet in Washington. The *letters* so much relied on show that there was no such contract *anterior* to the marriage. The second letter shows that the first was not regarded by either party as containing a *concluded* contract—the matter was not then *settled*. The third letter shows that the conversation in Washington was regarded only as expressing *a desire* by Stoddert to take the purchase of the farm off Bowie's hands. These letters and the whole evidence then shows that up to the period of the marriage there was no fixed, concluded agreement made. If then there was no agreement before marriage, any contract after marriage, in consideration thereof, was a mere *nudum pactum*, which cannot be enforced either at law or in equity. *Atherly on Marriage Settlements*, 85, (27 *Law Lib.*, 45.) There is no case where an agreement *executory* made *after* marriage has been sustained where the consideration was merely the *previous marriage*. The case of *Dugan vs. Gittings* was one of an *executed* contract, whilst this is merely *executory*. 27 *Law Lib.*, 78.

2nd. The alleged contract, if any, was a mere verbal one, void by the statute of frauds, and cannot be enforced against

the defendants, all of whom rely upon and plead the statute. The witnesses were examined for the purpose of proving a parol contract, and this concedes there was no *written* one. The one excludes the other, for if it was in writing, parol testimony of it is inadmissible. If they rely upon the letters they must look to them *alone*, and their defects cannot be supplied by parol proof. But it is said there has been *part performance*. Part performance never takes a case out of the statute because it would be unjust and inequitable that the *contract* should not be performed, but only where the *part performance itself, per se*, would make the non-enforcement of the contract inequitable. Such is the law and now apply it to this case. Bowie's giving $6000 does not make his not giving the other $4000 inequitable. This is nothing of which the other parties can complain——it is no fraud upon them. 1 *Sch. & Lef.*, 41, *Clinan vs. Cooke.* 1 *Sugden on Vendors*, 150. Marriage alone is no part performance. 66 *Law Lib.*, 50. The rule is, that the acts of part performance must be of the identical contract set up, and such as would not have been done except for the contract. 3 *Md. Rep.*, 480, *Ches. & Ohio Canal Co.*, vs. *Young.* There was no part performance by Stoddert. He has simply bought the farm and taken the title to *himself*, and holds it to this day. This was no part performance of the contract. He agrees to nothing, signs no instrument of writing, answers none of Bowie's letters. In short there is no proof that *anterior* to the marriage he made any contract whatever.

3rd. The record shows that Bowie, at the date of the alleged contract, was insolvent, and an actual settlement by him, even after the marriage of his son, in conformity with a verbal contract made by him before the marriage, would not be enforced against his creditors. 7 *Gill*, 362, *Clabaugh* vs. *Birely. Story's Eq.*, sec. 374. 3 *Johns. Ch. Rep.*, 491, *Reade vs. Livingston.* 5 *Gill*, 449, *Worthington vs. Shipley.* But here the application is for the specific performance of an executory contract to the prejudice of creditors. Under such circumstances we say it *cannot* be enforced. But it is said

the creditors are not here and that the executor simply denies the existence of the contract, and that he cannot avoid it upon the ground that it is in fraud of creditors. We insist that he could, *as executor,* take this defence, but he is also a *creditor* and stands here *as such.* But there has been a bill filed by creditors for the sale of the real estate and the sale has been made. This court then can only say to the appellants, if their claim be established, that they must go into that case, file their claim there, and then the other creditors may take every defence against it, which would in effect open up the whole case again. The executor, therefore, will be allowed *here* to stand in the place of creditors and make these defences.

4th. The appellants, by their examination of the executor of Bowie, who is made a defendant only in his character as executor, have precluded themselves from any recovery against the personal estate of the deceased in the hands of the executor; and as the personal estate is the primary fund for the payment of any claim of the appellants, they have necessarily precluded themselves from any recovery against the real assets of the deceased, which are only in the nature of a surety for the sufficiency of the personal assets. 2 *Brown's Ch. Rep.,* 164, *Thompson vs. Harrison.* 2 *Daniel's Ch. Pr.,* 1040. *Gresly's Eq. Ev.,* 340. 2 *Ambler, by Blunt,* 817, *note* 1. 3 *Atk.,* 95, *Mabank vs. Metcalf. Ibid.,* 603 *Fotherby vs. Pate.* 3 *Dow.,* 133, *Bernal vs. Marquis of Donegal.* 1 *Beattie,* 356, *Gould vs. Keefe. Ibid.,* 356, *Massey vs. Massey.* 1 *Cox,* 344. 1 *Young,* 602, *Hulton vs. Sandys.*

ECCLESTON, J., delivered the opinion of this court.

In the argument, the case of *Bowie's Exc'r, vs. Bowie,* 1 *Md. Rep.,* 87, was much relied upon in support of the appellants' claim in this suit, but that case differs very essentially from this. There the testimony of the appellant, John T. Stoddert, which had considerable influence in support of the contract, was before the court and is not here. That was a replevin to recover possession of property actually delivered under a

contract which R. W. Bowie said had been made requiring him so to deliver. This is an application to a court of equity for a specific execution of the unexecuted portion of an alleged agreement. In such case it is not only necessary to prove that an agreement was made, but the terms of the agreement must be so clearly and fully shown as that the court can have no difficulty in knowing what the terms are, so as to be certain of carrying into effect the contract made by the parties. Passing a decree for specific execution upon proof short of this, instead of executing the agreement of the parties, would be making one for them, which the court certainly has no authority to do.

On page 98 of 1 *Md. Rep.*, the court state a manifest distinction between that case and one similar to the present. And a distinction similar in principle will be found in *Crane vs. Gough*, 4 *Md. Rep.*, 331, 332.

There is nothing to show that any agreement was made between R. W. Bowie and his son or either of the parties to the marriage. If there was a contract which can be specifically executed, it was one entered into between R. W. Bowie and J. T. Stoddert.

To establish the existence of such a contract, the first proof relied upon consists of *three letters from Bowie to Stoddert.* The first is dated 12th December 1845, from which it appears Robert had informed his father of the matrimonial engagement, and of the willingness of Mr. Stoddert to make a settlement on his daughter of real estate. Reasons are urged why the estate of the late Mr. B. C. Worthington should not be purchased by Mr. Stoddert, and Mr. Bowie offers to sell one of his own to him for the purpose of the settlement. Mr. Bowie states his inability then to do as much for his son as he could wish, but in a subsequent part of the letter he says, "I can give Robert some eight or ten thousand dollars in personal property, (without which a farm would be of no use to him,) as soon as he is married. Hereafter I hope to assist him more."

The second letter, dated 31st December 1845, begins by

saying, "I received by my son Robert your letter of the 15th instant in reply to mine, on the subject of his intermarriage with your daughter." That reply is not in evidence, and we have no knowledge of its contents except what is to be derived from the remarks of Mr. Bowie. It is very evident, however, that it cannot be considered as an acceptance of, or assent to, the propositions which had been submitted; for, speaking of the young people, Mr. Bowie says: "It is only necessary to give them a good start, and that I hope may be done without much inconvenience to those to whom they are now looking for assistance. You say that on this subject you prefer a conference with me to a written correspondence. You are right. It is precisely what I desire." He then proposes a meeting at Washington, on the 9th of January following, and says, "I see no reason to apprehend that any difficulty can arise to intercept the early settlement of this matter." At that time, of course, no arrangement had been agreed upon, for if the parties had already made an agreement, the proposed personal interview would have been unnecessary, and any remark in regard to apprehending or not apprehending any difficulty arising "to intercept the early settlement of this matter" would have been useless and uncalled for. The matter to be settled, and the conference to effect the settlement of it, clearly related to making an arrangement for the purpose of giving the young people "a good start" in life.

The third letter is dated 27th May 1846, one day prior to the marriage. In this Mr. Stoddert is informed that Mr. Bowie had closed his purchase of the Nottingham Farm and obtained a deed for it. That the portion which he retained cost him about $10,700, and was in the possession of Robert. Mr. Bowie then says: "Regarding our conversation in our last interview at Washington as expressing a desire to take this purchase off my hands, I have only to say that I am quite willing to let you have it at cost—the payment to suit your convenience." "The house," he adds, "is very comfortably fitted up, with quite as much furniture as young beginners

ought to have." This does not prove that any agreement had been made. If Stoddert, in the interview, induced Bowie to believe he desired to purchase his farm without making the purchase, that could no more justify the inference of an intention on the part of Stoddert to buy it for the purpose of carrying into effect an agreement already concluded, than to suppose such a purchase was designed as one of the items to be included in a contract then in treaty but not finally agreed upon.

These letters are all the written evidence offered to establish the marriage settlement. They do not sufficiently prove it. At most they amount only to evidence showing a treaty in regard to one in contemplation.

It is unnecessary to decide whether this is a case in which parol proof may be used in connection with written evidence to establish the alleged agreement, for allowing the appellants to be right in affirming that this may be done, still the proof is not sufficient to entitle them to the relief they ask. And in coming to this conclusion we have assumed, without deciding, that the testimony of T. F. Bowie, Esq., is admissible.

If an agreement has been proved, the terms of it are disclosed with so much want of certainty and clearness, that a court of equity would not be authorised to decree a specific performance.

In his first letter R. W. Bowie says he "can give Robert some eight or ten thousand dollars in personal property." A few days after the marriage Dr. Maccubbin heard a conversation in which R. W. Bowie was urging upon Stoddert the purchase of the Nottingham Farm for his daughter, saying at the time if Stoddert would buy it, he, Bowie, would furnish his son Robert with personal property to the amount of $10,000, the object of the two being to start the young couple in life. The witness does not state whether Stoddert acceded to this proposition or not, but he heard him say on that occasion they *would* furnish them, (meaning the young married people,) with a very pretty start. This was the last of May or first of June. In July following Stoddert bought

the farm and in November had it conveyed to himself in fee-simple, but made no conveyance of it to his daughter.

From the testimony of T. F. Bowie, Esq., it appears R. W. Bowie stated his understanding of the agreement was, that he should give his son from six to ten thousand dollars. At which time he asked the witness whether he had not the option to give the lower sum; and said he thought the negroes and some furniture which he had given his son amounted to nearly $6000, he claiming the right to say that should be the amount he was to give, Major Stoddert claiming the larger sum.

Robert Bowie, the nephew of R. W. Bowie, says he heard a good deal on the subject from his uncle before and after the marriage. He always understood from his uncle that he and Major Stoddert had made an agreement to set up their children in life, free and unencumbered, and to support them until they made a crop; that Major Stoddert was to buy land and Bowie was to furnish an equivalent in stock, and was also to support them for twelve months, or until a crop was got out. Prior to the marriage various propositions were made for the purchase of farms of different values, and finally, before the marriage, Bowie informed the witness he had proposed to Stoddert the purchase of the Nottingham Farm, and it met Stoddert's views as to the value of the farm proper for the young people. The witness had repeated conversations with his uncle after the marriage, in which he complained that Stoddert had not complied with his share of the contract by deeding the land to his daughter, while he considered himself as having nearly performed his part of it; but Bowie's views on that subject, as to the extent of the provisions he was to make, were not as great after the marriage as they had been before it. This witness likewise says R. W. Bowie never denied that he had made such contract.

R. Johnson, Esq., gives a conversation which took place at his house a few weeks prior to the marriage, in which R. W. Bowie said it was probable the marriage would take place, but that it depended on certain arrangements being

before made between himself and Mr. Stoddert; that he was going on that or the next day to Washington, to meet Mr. Stoddert on the subject. The witness understood that the arrangements were of a pecuniary character, and for the support of the married parties; money was to be advanced by one and property by the other of the two parents, and in consideration of the marriage; but what the amount was to be, the witness had no such recollection of as would justify him in stating it.

The letters were offered in evidence by the complainants, and the parol testimony alluded to came from their witnesses.

This cannot be regarded as coming within the class of cases cited in argument, in which positive, unqualified, or unconditional proposals, promises, or expressions of intention, may have been made by a parent to a child, or to a third party, and made known to the child, constituting an inducement for the marriage. For here the son was the party who first informed his father of the willingness of Mr. Stoddert to make a settlement of real estate on his daughter; and the son was the bearer of the first two letters from Mr. Bowie; it is, therefore, a reasonable inference that he knew the nature and character of the negotiation, especially as Mr. Stoddert is referred to the son, in the first letter, for an explanation of matters spoken of in it. The letters contain intrinsic evidence of the fact, that Bowie did not design creating any obligation on himself, except through an agreement with Stoddert. And the parol proof shows the same. If not so, why was the personal interview necessary? Why inform Mr. Johnson of the expected meeting, and that the arrangements to be made were of a pecuniary character for the support of the parties about to be married, one of the parents to advance money and the other property, in consideration of the marriage? It then becomes necessary to show that a contract was made between the two parents, and what were the terms agreed upon.

The provision in the fourth section of the statute of frauds, requiring agreements in consideration of marriage, or some

memorandum or note thereof, should be in writing, was designed to furnish satisfactory and certain evidence of such contracts, and to guard against the danger of parol proof in matters where it would be very likely to lead to perjury and fraud; or, at all events, where it might be misapprehended and misconstrued. It is therefore to be regretted that the courts have not adhered more closely to this provision of the statute. They have, however, held that a parol contract, partly performed, may be enforced; but in doing this, the original design of the statute had sufficient influence to induce the courts to require the fact of the agreement, and its terms also to be clearly proved. *Atherly on Marriage Settlements*, in 27 *Law Lib.*, *marginal page* 88. The same author, on page 82, whilst speaking even of letters, says, they "also are considered as good marriage contracts, provided they sufficiently furnish the terms of the agreement." And on page 84 it is said, "the letter must not only contain an express promise, but the nature and extent of it must sufficiently appear."

We are told in *McQueen on Husband and Wife*, in 66 *Law Lib.*, *marginal page* 238, that "promises and agreements in consideration of marriage, in order to be binding, must be positive and unqualified."

See also 1 *Sugden on Vendors*, 243, 244, (6th *Am. Ed.*,) as to the necessity for an agreement to be certain when a specific performance is asked.

In *Worley vs. Walling*, 1 *H. & J.*, 208, an unsuccessful attempt was made to enforce a marriage contract based on parol evidence. Chancellor Hanson, (whose decision was affirmed by the Court of Appeals,) speaks of the statute of frauds as a most wise and salutary law. And not without some apparent reluctance does he concede that the court of chancery had compelled the performance of parol contracts, "admitted by the parties to have been made, or clearly proved to have been made, and partly carried into effect."

In *Wingate vs. Dail*, 2 *H. & J.*, 76, the complainant made an effort to establish a contract by parol proof, but his bill was dismissed, and the Court of Appeals affirmed the decree.

5      v.b

The chancellor admits, that under some circumstances the court would enforce the performance of parol contracts, but never "where it remains uncertain whether or not there was any contract, and even if there was a contract, it does not appear clearly what was the engagement on the complainant." And in regard to the absolute necessity for clear proof of the contract, and also of the unequivocal character of acts in part performance, see 3 *Md. Rep.*, 490, *Chesapeake and Ohio Canal Co.*, *vs. Young*, and 1 *John. Ch. Rep.*, 132, *Phillips vs. Thompson.*

In *Gough vs. Crane*, 3 *Md. Ch. Decisions*, 132, 133, Chancellor Johnson announces, in most unequivocal terms, that clear proof of the contract must be given by a party wishing to take a case out of the statute on the ground of part performance. He considers the principle "too firmly settled to be shaken or drawn in question," and that all the recent cases manifest a disinclination in the courts to make further inroads upon the statute, by excepting cases from its operation. The disposition, he thinks, "is rather to retrace the steps which have been taken, in what is now considered the wrong direction, but, at all events, if this is not so, a firm determination exists to make no further relaxation of the statute." Although the decision of the learned chancellor in that case was reversed, the appellate court did not differ from him in the views to which we have here referred; but, on the contrary they recognised them as correct, by saying, on *page* 334 of 4 *Md. Rep.*, "The answer of Mrs. Drury to the first cross-interrogatory of the complainant, and the testimony of Dr. R. M. Jones, is a sufficient compliance with the requisition of the rule, which makes it incumbent on the party insisting upon the non-application of the statute, to establish his case by distinct and full proof."

In *Lord Walpole vs. Lord Orford*, 3 *Ves.*, 420, the lord chancellor uses the following emphatic language: "I lay it down as a general proposition, to which I know no limitation, that all agreements, in order to be executed in this court, must be certain and defined." And in *Fonbl. Equi.*, *Book 1*,

DECEMBER TERM, 1853.    35

Stoddert, et al., vs. Bowie's Exe'r, et al.

*ch.* 3, *sec.* 8, near the end of *note d*, it is said: "It may be material here to observe, that even the cases which most favor the opinion that courts of equity may compel the performance, and consequently the discovery, of merely parol agreements, require that the *terms* of such agreements should be *clear, definite and conclusive.*" This note Mr. Justice Story considers so valuable, that though long, he cites it at large in *note 4 to section* 758, in the *2nd Vol.* of his *Equi. Jur.*

In *Griffith vs. The Frederick County Bank, et al.,* 6 *G. & J.,* 439, the court quote, with approbation, the language of *Powell on Cont.,* that "no rule is better established than that every agreement, to merit the interposition of a court of equity in its favor, must be fair, just, reasonable, *bona fide, certain in all its parts,* mutual," &c. And the court then say: "If any of these ingredients are wanting, courts of equity will not decree a specific performance." See also *Murndorff and Wife, vs. Kilbourn, et al.,* 4 *Md. Rep.,* 459.

Admitting that a contract was made between Bowie and Stoddert, can it be said the proof shows the terms of it, in reference to the extent of the obligation of the former, with that degree of certainty required in such a case? We think not. In his first letter, some *eight or ten thousand dollars* in personal property is what he says he *can* give Robert, and thereafter hoping to assist him more. If this is to be understood, not only as an expression of ability, but also of willingness to give, it was nothing more than an offer by which he felt disposed to bind himself, if acceded to by Stoddert, and he would agree to purchase a farm for his daughter; or, in other words, if an arrangement satisfactory to both could be made. This is evident from the general scope of the letter, and from the immediate connection in which the personal property is spoken of with the farm. That the parties so understood the matter, appears from the subsequent arrangement for a personal interview, in preference to a written correspondence on the subject. No part of the evidence shows that the offer or suggestion of *eight* or *ten thousand dollars* was ever assented to by Stoddert, or agreed upon between the parties. On the contrary, the declarations of R. W.

Bowie, as stated by T. F. Bowie, tend to show his understanding of the contract was, that he agreed to give his son Robert from *six to ten thousand dollars*, he claiming the option to give the smaller sum, and that he had given negroes and furniture nearly to that amount, but Major Stoddert claimed the larger sum. When this conversation took place, whether before or after the marriage, does not appear.

In the conversation which Dr. Maccubbin speaks of as occurring shortly after the wedding, Bowie told Stoddert he would furnish his son with personal property to the amount of $10,000, if he, Stoddert, would buy the "Nottingham Farm" for his daughter. The witness does not say that Stoddert agreed to this proposition. That this sum was not agreed upon, may be fairly inferred from the testimony of T. F. Bowie and Robert Bowie. The latter speaks of repeated conversations with his uncle after the marriage, some of which, we suppose, must have been subsequent to the time alluded to by Dr. Maccubbin, as that was only a day or two after the marriage. And Robert Bowie says the views of his uncle as to the extent of the provisions he was to make, were not so great after the marriage as they had been before it. Of course the lesser amount here alluded to was less than $10,000, because that was the largest sum ever spoken of on the part of Bowie. The witness, R. Bowie, mentions no particular sum in any part of his testimony.

The conversation alluded to by T. F. Bowie most probably occurred, not only subsequent to the wedding, but after the purchase of the farm by Stoddert; for the testimony shows, that at the time of the conversation there was a dispute or difference of opinion between the parties, in regard to the extent of Bowie's obligation. And it is not probable that Stoddert would have made the purchase, if it was designed for his daughter under the contract, knowing at the time that there was a misunderstanding as to the terms of the contract.

The testimony, taken altogether, presents a very doubtful case instead of a clear one.

Feeling unwilling to infringe upon the salutary provisions

of the statute of frauds, further than the well settled principles
of adjudged cases compel us to go, we are not disposed to
enforce contracts depending upon parol testimony and part
performance, unless the existence of the contract, its terms,
and the acts in part performance, are sustained by clear and
satisfactory proof. And this, we think, has not been done
in the case before us; of course the decision below will be
affirmed, and a decree to that effect will be signed.

*Decree affirmed.*