### MYRON P. WALKER *vs.* MARY N. WALKER.

Hampshire.   December 5, 1899. — March 1, 1900.

Present: HOLMES, C. J., KNOWLTON, BARKER, HAMMOND, & LORING, JJ.

*Memorandum of Contract — Letter — Signature — Statute of Frauds — Contract to transfer Property in Consideration of Marriage — Allegations of Bill in Equity.*

It is immaterial that the memorandum of an alleged contract is in the form of a letter, if it is sufficient in other respects to satisfy the statute of frauds.

The signing by the defendant by his Christian name only is as binding upon him, within the statute of frauds, as if his signature were written in full.

The fact that an alleged antenuptial contract did not contain a schedule of the property to be affected by it, and was not recorded in the registry of deeds, does not affect its validity as between the original parties to it, the requirements of the statutes in regard to schedules and recording being for the protection of creditors.

The averments of the bill in equity in this case, brought by a husband against his wife to enforce an alleged antenuptial agreement made by her, are not sufficient to entitle the plaintiff to an interest in his wife's estate while they are living apart after a permanent separation.

BILL IN EQUITY by a husband against his wife to enforce an antenuptial agreement made by her and to secure his rights to the property covered by that agreement. The defendant demurred to the bill, assigning various grounds therefor, and *Barker,* J., at the request of the parties, reserved the case for the determination of the full court. The facts appear in the opinion.

*E. H. Lathrop,* for the defendant, submitted the case on a brief.

*E. C. Bumpus & E. A. Whitman,* for the plaintiff.

KNOWLTON, J. Some of the causes for demurrer relied on by the defendant are insufficient. It is immaterial that the memorandum of the alleged contract is in the form of a letter, if it is sufficient in other respects. *Smith* v. *Allen,* 5 Allen, 454. *Stoddert* v. *Bowie,* 5 Md. 18. *Peck* v. *Vandemark,* 99 N. Y. 29. The signing by the defendant by her Christian name only is as binding upon her as if her signature were written in full. *Sanborn* v. *Flagler,* 9 Allen, 474. That the alleged contract did not contain a schedule of the property to be affected by it, and was not recorded in the registry of deeds, does not affect its validity as between the original parties to it. The requirements of the statutes in regard to schedules and recording are for the protection of creditors. Pub. Sts. c. 147, § 27. St. 1867, c. 248. *Cook* v. *Adams,* 169 Mass. 186.

The more difficult and important question in the case is whether the bill sets out a contract to transfer property from the defendant to the plaintiff in consideration of marriage. The plaintiff in the bill gives at length four letters, and says he has thirty-eight others, written while he was in California and the defendant in Europe, and while they were betrothed and were arranging for their expected marriage. The letters which are set out are affectionate, and are full of such matters of personal interest as a young woman might be expected to communicate to her future husband. In only two of them is there any reference to her property, or to her intentions in regard to the dis-

position or use of it.   In one of these, under date of September 3, 1877, is this language : " Now, dear Myron, for the practical part of your letter.   We cannot alter our circumstances.   Wo did not *make* them, and I assure you *they* cannot change me, but I shall certainly take every advantage that they offer to promote your interests.   I think you have struggled *nobly*, and been successful to an uncommon degree.   Now I should *like* to see what you could do in working for yourself alone.   As I hope to share in the honor and success that will some day crown your efforts, may I not also assist you in working to that end ?   I will tell you plainly what I intend to do.   The money that my father gave me before his death, I shall keep always for myself. Of that which has come to me *since*, I shall settle a generous portion upon each of the children, the interest of which will be more than sufficient to clothe and educate them with every advantage.   Having thus provided for them, so that no one can feel that I have jeopardized their interest in seeking my own happiness, and given some thousands to poor relations and friends, I shall consider the balance common property, neither thine nor mine, but *ours*, to be used for the general good in making a happy home, in building up a business, and in relieving the distress so prolific in this world of ours.   What do you think of my idea ?   I think I have answered the *main* points of your letter, though very briefly, and have *so much* to say on this subject, but not to-night."   In a letter of September 11, 1877, she wrote as follows : " Now, I want to say a word about money matters.   I am the only one of the family, that is, mother or the girls, who knows much about the position, size, etc., of father's estate.   Uncle sent me a memorandum when I requested it, asking me not to mention it, because he thought it would be unwise for the girls, or people outside, to have an idea of the extent of their means, and of course one has just as much as the other, only I, having family, use more than they do.   He assured me, and so did Jim, that no property anywhere in the United States was *better secured*, that it was much more profitable to us and easier for *him* to keep it together as long as there were minor children, which will be for five years yet, but if a majority wished it, division should be made.   Now I should *prefer* a moderate sum safely invested and under my own control, at the

same time, do not wish to force an issue that would look as though I lacked confidence in him or his judgment, because I do not. That is one reason why I have never told you anything definite about my affairs. I feel a pride in being able to say, when you go to him, as you must do before long, that you do *not* know of them, that I have *kept* the confidence he reposed in me, and that though 'in love' I can still be *just* and *practical.* I shall tell him, as I did you not long since, what my intentions are in regard to my property; an ample provision for the children and myself, and then the rest to be made use of to our mutual benefit. He seemed to find no · difficulty in spending $20,000 for me when I wished it, and I shall expect none in raising more when occasion requires." These are the only specific statements of either party referred to in the bill as a foundation for the plaintiff's contention that they entered into an antenuptial contract. Looking now at the first of these letters, it is to be noticed that the plaintiff does not aver that " the practical part," or " the main points," of his letter, which the defendant answered, purported to look towards the making of any contract in reference to property. He does not aver that he wrote in reply to either of these letters anything to show that he understood that the parties were making an antenuptial contract. She was a young woman with three children, who a short time before had been divorced from her husband, and who was possessed of property in her own right amounting to more than $500,000. He was a young man engaged in an insurance business in California and apparently without much property. The letters indicate that he had seemed to deprecate an alliance with a woman of so great wealth before he had himself achieved financial success, and that she sought to reassure him, and to show her desire freely to use her money as well for his benefit and enjoyment as for her own. Her feelings, and her expression of them, were founded on an expectation that they were to live together as husband and wife during their joint lives. Seemingly she did not permit a thought, much less an expression, which looked to a possibility of divorce or separation. In this letter she seems to be stating her intention in regard to the management and use of her property, rather than providing for a change of the title. Throughout this part of the letter she

speaks in the first person, without a suggestion that any one else is to displace her in her legal ownership, or that she is to abdicate her rights. She says in substance that after setting apart that which her father gave her, and making a generous settlement upon each of the children, and large gifts to poor relatives and friends, she is to hold the rest of her estate for their common use in their home life, in building up a business for him, "and in relieving the distress so prolific in this world of ours." Instead of saying that she shall convey a part to him and thus change the legal title, she says, "I shall consider the balance common property, neither thine nor mine, but *ours*, to be used for the general good." This plainly has reference to her intention as to the use of property of which she holds the title, rather than to an intention to transfer the ownership; and just as clearly it has reference to a use while they are living together in the ordinary relations of husband and wife, not to a use of it after a permanent separation.

If the meaning of this letter, taken by itself, or considered as a part of the general correspondence, were doubtful, the letter of September 11, taken in connection with the other letters, would make it clear. The defendant's letters show much sensitiveness in regard to the view which her relations and friends will take of the intended marriage, and particularly lest some of them should suspect the plaintiff of mercenary motives. In this letter she refers to the fact that she had never told the plaintiff anything definite about her affairs, and that she feels a pride in being able to say that he does not know of them. Here she impliedly repudiates in the strongest terms any possible suggestion that they had made or contemplated making an antenuptial contract. She wishes to have her uncle understand, that which she treats as a fact, that this will be a marriage into the arrangements for which considerations in regard to property have not entered. Referring to the previous letter to the plaintiff, she calls it an expression of "what my intentions are in regard to my property." Instead of treating it as a part of a contract, or as implying an intention to change the title, she refers to an intended provision for herself and the children, which she evidently regards as a special appropriation to be kept apart from the risks of ordinary financial changes, and states as her

intention as to the rest of her property that it is to be made use of for the mutual benefit of herself and her husband. Presumably it is so to be made use of while under her legal control.

It is contended that the averments as to the performance of the contract entitle the plaintiff to relief. But all of these averments, so far as they purport to rest upon a contract, are founded on these two letters. In the bill the plaintiff says that in marrying the parties acted " upon the terms and conditions set forth in the said letters referred to, and the other letters which may be examined, namely," etc. When he states as one of the terms of the letters that the balance was to " be treated and considered as common property, and should be held for the mutual benefit and interest, and belong to and be the property of both the parties concerned," he means, as we understand the letters, that the property, while belonging to the defendant as legal owner, was expected to be used for the common benefit while the parties lived together as husband and wife. The averments in regard to the turning over of the property by the defendant to the plaintiff under this contract mean nothing more than that she intrusted the property to his management and use for their joint benefit. This is the true legal interpretation to be put upon the averment of the bill, in which " the plaintiff further says that until his wife had taken possession of the estate as hereinafter set forth, the terms of the contract set forth in the letter dated September 3, 1877, and confirmed by letter dated September 11, 1877, and the other letters, were carried out by the parties, and the property was owned and held in common as the estate of both, to be held and enjoyed for their mutual benefit." In the beginning she undoubtedly had implicit confidence in him. Taking all of these averments together, it is the common case of a woman of large fortune who trusts the management and control of the whole of it to her husband for their joint benefit. The " strict accounting to her of the affairs of the estate " which he avers that he made in 1887, and again in 1890, after she had taken possession of it, are in accordance with this view. The bill does not aver that any settlement was made upon either of the children, or that any formal action was ever taken, as if in execution of an antenuptial contract.

It is stated in the bill that there has been a permanent separation of the parties. If the plaintiff could enforce his claim upon the property in case his wife had wilfully refused to live with him without just cause, which we do not intimate, the bill does not show such a wrong on her part. The only alleged wrong charged against her is her taking and retention of the property. While the plaintiff avers that he faithfully performed his duties in regard to the care of the estate, he says nothing about his general conduct as a husband, and it does not appear whether the defendant was or was not justified in refusing to live with him.

We are of opinion that the averments of the bill are not enough to show an antenuptial contract which entitles the plaintiff to an interest in his wife's estate while they are living apart after a permanent separation.

*Demurrer sustained.*