DAVID E. WALSH, NICHOLAS J. WALSH, JAMES
WALSH AND JOSEPH A. WALSH, TRADING
AS WALSH BROTHERS.

*vs.*

CHARLES J. HIBBERD, TREASURER.

*Public policy: contracts void under—. Shoemaker Road Law:*
*agreement between petitioner*
*and contractor.*

A road had been petitioned for, under the Shoemaker Road
Law (Chapter 225, Acts of 1904), and the contract for its
construction given out, when certain of the petitioners found
that they would be unable to pay their assessment; thereupon
they entered into an agreement with the contractor by which,
upon certain considerations moving from them to the con-
tractor, such as stable room, storage facilities, rights of way,
etc., the contractors agreed to refund to such petitioners a part
of the assessment such petitioners would be required to pay:
*Held,* that such an agreement was against public policy, and
void.                                        p. 176

The recognition of such contracts would open the way for
the unnecessary expenditure of public money, and would tend
to introduce into the administration of the road system grave
injury to the public.                        p. 176

When a contract belongs to a class which is reprobated by public policy, it will be declared illegal, even though in that particular instance no actual injury may have resulted to the public, as the test is the evil tendency of the contract and not its actual results. p. 172

*Decided December 19th, 1913.*

Appeal from the Circuit Court for Carroll County (FORSYTHE, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON and URNER, JJ.

*James A. C. Bond* and *Francis Neal Parke* (with whom was *Michael E. Walsh,* on the brief), for the appellants.

*Edward O. Weant, State's Attorney for Carroll County,* and *Charles E. Fink,* for the appellee.

BURKE, J., delivered the opinion of the Court.

This is the defendants' appeal from a judgment entered against them in the Circuit Court for Carroll County. The facts are practically undisputed.

On the 15th day of February, 1910, the defendants, David E. Walsh, Nicholas J. Walsh, James Walsh and Joseph A. Walsh, trading as Walsh Brothers, executed and delivered a paper in the following words:

"New Windsor, Md., February 15, 1910.

"Seven months after date we promise to pay Charles J. Hibberd, Treasurer, the sum of four hundred seventy-seven dollars, or such sum of money as is equal to

the excess over one thousand dollars of ten per cent. of the total cost of improving and constructing one mile of public road from New Windsor toward Uniontown, as now contemplated. This is made in consideration of certain privileges to be given us by the committee, which privileges are stable room for twelve horses, land for shanty for men, driveway side of public road, removing fences, and privilege to close ice pond during the construction of culvert, and place for unloading sand, stone and lumber, and for cement."

This instrument of writing is the foundation of this suit. The declaration contained the common counts, and two special counts (the seventh and eighth), which are based on the above-quoted paper. The defendants demurred to these special counts. The Court overruled the demurrer, and the general issue pleas were then filed, upon which issue was joined. The case was tried before the Court, without a jury, and resulted in a verdict and judgment for the plaintiff for $573.26. The record contains two bills of exceptions taken by the defendants—one to the admission of the paper in evidence and the other to the action of the Court upon the prayers. The paper writing quoted constitutes the whole cause of action in this case, and if it does not constitute an enforceable contract, the judgment must be reversed without awarding a new trial.

In determining the validity of that instrument as an enforceable contract, it is necessary to ascertain the exact purpose and the circumstances under which it was given. The record shows that on the 28th day of March, 1908, John C. Buckey, Charles J. Hibberd and others filed in the office of the County Commissioners of Carroll County a petition in these words:

"We, the undersigned, owners of two-thirds of the land binding upon the section of the public road leading from New Windsor, in said Carroll County, and State, to Uniontown, in the county and State afore-

said, said section of road beginning at the N. W. line of the corporate limits of New Windsor, Md., and ending at Hyde's Hill, being about one mile long, respectfully represent to your Board of Commissioners that we desire to have said section of said road constructed under the provisions of Chapter 225 of the Acts of the General Assembly of Maryland, passed at its January Session, 1904.

"And we further state that we, the undersigned petitioners, are willing to pay for the construction of said section of said road, a sum equal to ten per cent. of such construction.

"And we further request your said Board of Commissioners to make the proper request of the proper commission as required by said Act of Assembly."

The county at that time was short of funds, and for that reason no action was taken upon the petition for some considerable time. On the 14th day of February, 1910, the defendants submitted a bid for the construction of the section of the road named in the petition, according to specifications, for the sum of $14,770.00. The contract for the work was awarded to the defendants by the Commissioners on February 16, 1910, and was approved by the State Geological and Economic Survey, as required by Chapter 225 of the Acts of 1904. The defendants executed and delivered a bond as required by the Act. They had difficulty with the work and the contract was rescinded by the County Commissioners and the work was taken over by Thomas, Poole and Hunter, who completed it under the terms of the original contract. The total cost of this construction was $15,732.60. The law imposed upon the petitioners the obligation to pay $1,573.26 of this amount. One of the purposes of the contract sued on was to relieve the petitioners of a portion of this obligation, to wit: $573.26, and to impose an obligation for the payment of that amount upon the defendants.

The petition was filed under section 2, Chapter 225 of the Acts of 1904. This section is known as the involuntary fea-

ture of the Shoemaker Road Law, and when a proper petition under that section is filed with the Commissioners, it becomes their duty to make a request to the State Roads Commission for plans and specifications and an estimate of cost of the performance of the work according to said plans and specifications. At the time the petition in this case was filed, that request was required to be made to the State Geological and Economic Survey created by the Act of 1896, Chapter 51.

The cost of the preliminary work is payable by the county. If ten per cent. of the estimated cost shall be paid, or secured to be paid, where the proceedings are under the involuntary section of the act, the County Commissioners shall advertise for bids for such road construction or improvement, and the contract, if awarded, shall be to the lowest responsible bidder. In *Fout* v. *Frederick County,* 105 Md. 545, the Court, after a consideration of each section of the Act of 1904, Chapter 225, said that it provided checks and restraints for the protection of the county against unwise, unnecessary, wasteful or improvident expenditure of public money under the involuntary feature of the law. That act prescribed certain and definite conditions under which any particular road or section thereof might be built or improved, and that work could be done only in substantial compliance with the provisions of the act, and in no other way. The petitioners in this case were not able to raise the ten per cent. of the cost of the improvement. Nor had they, prior to February 16, 1910, when the contract was awarded, given bond for the payment of that proportion of the cost, and it seems to be reasonably certain from the evidence that the contract would not have been awarded, had not the paper sued on been executed. The execution of that paper induced the giving of the bond by the petitioners and the awarding of the contract to the defendants. Mr. Buckey, one of the petitioners, testified that "The object of the agreement was to insure to us—the property owners— no greater liability than one thousand dollars, and whatever the road might cost over the one thousand dollars the Walsh Brothers would make up." At the conclusion of the testi-

mony the defendants offered four prayers, each of which was designed to withdraw the case from the jury. There were no prayers offered by the plaintiffs. Defendants' prayers were refused, and this action of the Court constitutes the second bill of exceptions. Upon the facts stated, the important legal question in the case is this: Is the agreement of February 15, 1910, which constitutes the cause of action in this case, void because it is against public policy?

No actual injury resulted to the public from this particular contract, and the parties to it, it may be conceded, were not conscious that they were doing a thing which the law did not approve, or would not sanction. The law refuses to enforce a contract which is contrary to public policy, not from any consideration or regard to the defendant; but its refusal "is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff."

"Where a contract belongs to a class which is reprobated by public policy, it will be declared illegal, though, in that particular instance, no actual injury may have resulted to the public, as the test is the evil tendency of the contract, and not its actual result." 15 Am. & Eng. Ency. of Law (2nd ed.) 934.

JUDGE McSHERRY, in American Casualty Company's Case, 82 Md. 535, said: "No exact definition of public policy has ever been given or can be found. Speaking generally, the principles which holds that no one can lawfully do that which has a tendency to be injurious to the public, or against the public good, may be termed the policy of the law, or public policy in relation to the administration of the law." 19 Am. & Eng. Ency. of Law 565.

In Richardson v. Mellish, 2 Bing. 229, Mr. JUSTICE BURROUGHS pointedly observed: "I, for one, protest against arguing too strongly upon public policy; it is a very unruly horse, and when once you get astride it, you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when all other points fail. It is one

thing at one time, another thing at another time, and its very vagueness shows that it does not admit of exact or precise definition, and that it is not easily explained."

But, as stated by *Greenhood on Public Policy,* 3 : "The element of public policy in the law of contracts, and in the law generally, is, by no means, of recent origin, but owes its existence to the very sources from which our common law is supplied. In fact, it pervades it in every place we feel. Look into the law of constructive notice, and we find what one judge called 'an unruly horse' pursuing us; if we investigate the true reasons upon which the doctrine of *respondeat superior* is founded, we find the same thing all-controlling. It is the same element which seals the lips of a counsel forever against any disclosure of confidential communications from his client; it protects the home by denying to either husband or wife the power to reveal the secrets told to each other; it secures the people against the corruption of justice or the public service, and places itself as a barrier before all devices to disregard public convenience * * *. It is the corner stone of the whole structure of *res judicata* itself. We hear now and then complaints against the application of public policy to the law; that it is an usurpation of legislative power; that the Legislature is the only competent guardian of the interests of the people,—the only authorized interpreter of their sentiments,—and that the power of the Courts should be confined to such matters of policy as the Legislature has dictated. Its defenders, however, have only to point with pride to the numerous rules of law which are based upon it, to justify the action of the Courts."

We have no disposition to create a new head of public policy, or to extend the established and well-settled rules to cases not falling fairly within them. But we cannot escape the conclusion that contracts of the character sued on in this case are against public policy and void; *first,* because they are in evasion of the law; and, *secondly,* because they are evil in their tendency. The recognition of such contracts would open

wide the door for fraud on the law and for the imposition of unjust burdens upon the people.

The proceeding inaugurated by the petitioners was, in legal contemplation, for the benefit and advantage of the people generally. In *Jacobs* v. *Tobiason*, 65 Iowa, 245; S. C. 54 *Am. Rep.* 9, it was held that a contract made with a view of *preventing* the establishment of a public highway was contrary to public policy and void. "Proceedings for the establishment of public highways," said the Court, "are essentially public in their character. They are in the exercise by the State of one of its sovereign powers. The rights which are established and the privileges which are created by the proceedings are for the benefit of the whole people.

"The proceeding can be instituted, it is true, only on the petition of some member of the public who is interested in the question. * * * It is a proceeding by the State, for the benefit and advantage of all the people of the State, and the petitioner acquires no special rights or advantages by it. In so far as his efforts are instrumental in procuring the establishment of a highway, he acts for the public. In instituting and carrying on the proceedings he acts, in a sense, in a public capacity. He invokes the powers of the State, and it is exercised for the benefit of the common public, and he, in a sense, represents that public, and stands for it in the proceeding. It is true, he cannot be compelled to institute the proceeding, and it may be true also that, having voluntarily begun it, he can not be compelled to continue it to a final result. If it turns out that the burdens likely to be imposed upon him are greater than was anticipated when he instituted the proceedings, it may be that he has the right to retire from them or discontinue them entirely. But when he has assumed a position of trust toward the public, and instituted a proceeding of public concern, he can not be permitted to make the question whether he will remain in the position or continue the proceeding a matter of private gain for his own emolument. One occupying a public office has the undoubted right to resign his position. But if a

public officer were to agree with one who, for any reason, was desirous that a vacancy in the office should be created, that for a money consideration he would resign the office, it would hardly be contended that such contract was enforceable. Yet it seems to us there is no difference in principle between that case and the one before us. The highest considerations of public policy demand that all duties in which the State and the public are concerned shall be performed with fidelity; and no man who has once assumed the performance of such duties should be permitted to make the question whether he will continue in their performance a matter of private speculation."

There are stronger reasons for holding that a contract between petitioners for a road and the contractors, which induced the opening of the road, should be void, because the abuses and evil consequences to the public might be much greater. The Iowa case announces the safe rule which should be applied to cases of this kind. It was the manifest intention of the Act of 1904, Chapter 225, that the petitioners for the road or the improvement thereof should actually assume their share of the cost of the work, and any arrangement, or combination, or agreement with contractors, whereby they may be relieved of the duties and obligations imposed by the law, either directly or indirectly, is a fraud on, or, at least, a palpable evasion of the law. The recognition of such contracts would open the way for the unnecessary expenditure of public money, and would tend to introduce into the administration of the road system grave injury to the public. For the reasons stated, the judgment will be reversed without awarding a new trial.

> *Judgment reversed, without awarding new*
> *trial. Costs to be paid by the appellee.*