THE MAYOR AND COUNCIL OF ROCKVILLE
*v.* BROOKEVILLE TURNPIKE CONSTRUCTION COMPANY, INC.

[No. 89, September Term, 1966.]

*Decided April 4, 1967.*

*Motion for rehearing filed May 3, 1967, denied May 10, 1967.*

The cause was argued on January 17, 1967, before HAMMOND, C. J., and MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.; and reargued on April 3, 1967, before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*George W. Shadoan, City Attorney* and *William C. Staley, Assistant City Attorney* (on both arguments) for appellants.

*Alfred H. Carter* and *Vivian V. Simpson* (on both arguments), with whom were *Joseph B. Simpson, Jr., H. Algire McFaul, Thomas A. Lohm* and *Simpson & Simpson* on the brief, for appellee.

HAMMOND, C. J., delivered the majority opinion of the Court. BARNES and MARBURY, JJ., dissent. Dissenting opinion by BARNES, J., at page 135, *infra*.

This case has spawned some red herrings which the parties and the Chancellor have dropped across an essentially simple trail of fact and controlling law.

The City of Rockville sought below to enforce specifically a written contract dated January 1962 between the City and an owner who was trying to transform raw land mostly within, but partly without, the City limits into over four hundred apartment units. The City agreed "to act, insofar as it is permitted by law, to annex" that part of the land outside its corporate limits in return for the promises of the landowner (a) to dedicate by December 28, 1962, approximately half an acre of delineated land for a street, (b) to set aside and develop two specified areas within the development for the recreational use of its residents, and (c) to attempt to purchase an additional defined three-acre parcel of land adjacent to that outside Rockville and, if successful, to dedicate the purchased parcel "permanently to recreational use" or, if unsuccessful by July 1, 1962, to pay the City $10,000 in four annual installments, "the said sums to be used by the City for the purpose of acquiring and developing additional public recreation area."

The City proceeded to annex the land but the developer (which will sometime hereinafter be called Gingery as it was a corporate alter ego of its president, D. E. Gingery, who consistently acted and spoke for it) refused to perform its promises except as to the payment under protest of a $3,000 installment; indeed, Gingery testified in the City's suit for specific performance that he had never intended to honor the contract.

In its appeal from the Chancellor's denial of specific performance, the City has tossed us at least one red herring in an effort to picture itself as undeviatingly without hint of reproach. In return, Gingery drew more of the ruddy aquatic vertebrates across the trail in order to paint himself as the helpless and hapless victim of governmental injustice and oppression, compelled by the evil municipal pressure of economic duress and coercion of frustrating delay to fight fire with fire by signing an agree-

ment he did not intend to honor. More of the fishes emerged from the Chancellor's expressed reasons for denying the City relief. He said, entirely accurately in the abstract, that specific performance is an extraordinary remedy which is within the sound discretion of the court to grant or refuse and that a determination to grant this extraordinary remedy must be supported by a contract that is "fair, just, reasonable, bona fide, mutual, useful, made upon a good and valuable consideration consistent with a well regulated society and * * * in its effect ultimately tend to produce a just end" and held that the contract in question lacked mutuality, was illegal as beyond the power of the City, unconscionable as setting up at auction to the highest bidder the exercise of the City's power to annex land, and extortionate in that the City by delaying action on the request for annexation compelled the developer to accede to its illegal demands.

We do not agree, finding that the City had the power and the right to exact the agreements made by Gingery in return for its promise to annex his land, that the contract was voluntarily entered into and that it did not lack mutuality.

In 1958 Gingery bought some nineteen acres of land, somewhat more than fifteen acres of which were within the City of Rockville and 3.55 acres of which were not, being under the zoning and other controls of Montgomery County. The tract was all zoned C-2. In October 1959 application was made to the City to rezone that part of the land within the City to R-20 (medium density residential). In November the application came before the Mayor and Council. A member of a firm of architects and engineers presented a site plan which showed the entire nineteen acres as developed for garden apartments. The plan showed the dedication of a street along one boundary of the property designated as Edmonston Road and several small play areas and a large recreation area within the project. Gingery testified that he intended later to apply to have the 3.55 acres in Montgomery County annexed to Rockville. In reply to a question from Mayor Greene, Gingery said that the large recreation area on the plat would not be dedicated but would remain in private ownership as part of the tract. He also said, in explaining the site plan, that provision was made for "the

location of parking, the location of Edmonston Drive, so that this could be dedicated, and the location of the recreational areas."

On January 19, 1960, the request for rezoning of the land within the City was granted without condition or reservation. Soon thereafter the Rockville Planning Commission approved a use permit for the apartment house project in accordance with a plat submitted. This plat also showed Edmonston Drive with the notation "to be dedicated" to a width of seventy feet.

Gingery, as sole owner of the property, later filed a petition for annexation of the 3.55 acre parcel and, simultaneously, requested its rezoning to R-20. After review the Planning Commission in writing recommended annexation and at the same time recommended placing the acreage in an R-S (Suburban Residential) zoning classification until the City "has had an opportunity to investigate whether there is a need to locate a playground on a portion of the subject tract which would serve the immediate area." The Commission went on to say:

"The Planning Commission notes with concern that no provision has been made by the developers of the adjoining properties of the subject tract or by the City of Rockville to provide a playground for the occupants of the existing and proposed apartments within the immediate area. Approximately four hundred ten (410) apartment dwellings are being built within the area bounded by Rockville Pike on the east, commercial development on the south, Woodmont Country Club on the west and West Edmonston Drive on the north. It is the view of the Commission that consideration should be given by the Mayor & Council regarding the need for, and the acquisition of, a playground of approximately two (2) acres in size to serve this area, prior to giving the subject tract a permanent zone classification."

Mayor Greene testified before the Chancellor that the general policy of the City was to require a community being annexed to provide interior and access streets, utilities, and "to provide recreational areas to serve that particular community"

on the theory that it would be an unfair burden on those citizens already living in the City to "support the heavy capital investment which a new section of the community brings with it." If the developer is required to provide the basic initial capital improvements, "you start at even points on capital investment and everybody's taxes are applied to the operations of this new community—everybody starts on an equal basis. * * * Otherwise the problem of obtaining any growth would be so burdensome to the existing community there would be a total rejection of growth. Your taxes would be infinitely increased." This, he concluded, makes it equitable to require that one who brings in a new community bring it up to the standard of the existing community at his expense, if he desires it to become part of the City.

Mayor Greene also testified that the standard of size the City used for neighborhood parks or recreational areas was one acre per hundred dwelling units, a downgrading of the standard "established by the National Association of Recreation which uses one acre per hundred people."

On January 16, 1961, a public hearing on the applications for annexation and rezoning was held before the Mayor and Council. Gingery and his lawyer attended. The lawyer pointed out that the 3.55 acres "could very easily (and will) become an integral part of the apartment project in the event it is zoned and annexed." In connection with the rezoning, he referred to the recommendation of the Planning Commission for recreational areas and said: "We have planned for a recreational area; we are going to install one in there to serve the residents of the apartments being constructed and to be constructed" and then suggested that the 3.55 acre plot would be unsuitable because it would require considerable grading and "it is very expensive ground. By using that for a recreation area, we would, of course, have to absorb that cost into that of the apartments, which would mean higher rents * * *. I do not feel that this would be a justifiable proposition."

The architect then spoke, suggesting that a six-acre parcel, which was a part of a twenty-four acre tract Gingery owned, formed by the extension of Jefferson Street and Julian Place, be used for an undedicated recreational site for the over four

hundred apartments and some five hundred homes Gingery intended to build on the twenty-four acres.

Gingery said: "This came about all to the credit of Mayor Greene. * * * It must have been at least a year ago, he asked me about recreation for apartments. I said 'Alex, we are going to provide recreation for that area.' * * * I made that promise. * * * There has never been any question of our living up to what we said."

Mayor Greene replied that in addition to the six acres there would still have to be dedicated public facilities to serve the area if the National Recreation Association standards were to be met.

Gingery's lawyer then agreed to suggestions from the Council that the prior approval of the use permit of the fifteen acres in the City was not "a tacit approval of the over-all project."

A councilman, Mr. Ecker, asked about the future Edmonston Drive. Gingery replied: "Frank, * * * may I explain * * *. On Exhibit 1B, it was done this way; then they asked that it be done another way. So we did that. This is the final way."

Mr. Tuchton, another councilman, asked whether there was "a time table which Mr. Gingery is prepared to talk about here, in terms of this recreational development." Gingery said: "It would have to be executed basically along about the same time this project over yonder [the twenty-four acres] was proposed to go ahead." Mayor Greene asked if this meant that the recreational area depended "on the rezoning of the other piece of property" and whether if rezoning were not granted on that property the recreation area would go ahead. Mr. Gingery replied: "I do not know." Mayor Greene said: "If the public interest decides a recreation center is necessary, the public interest has to be considered * * * and that this raised a question whether action should be taken "with respect to the development of recreation land contingent upon some future legislative action."

Gingery contends on appeal that after the public hearing he kept urging action because the delay was causing him financial loss. The City took no action because, it must necessarily be

inferred, Gingery did not convey to it the land for Edmonston Drive nor create or provide the large recreational area he had suggested, nor any other. Gingery claims he had "considered but never promised," prior to the agreement sued on, to dedicate a right-of-way for the proposed Edmonston Drive when it touched the northern boundary of the entire nineteen-acre tract (actually, as the facts recited above show he did promise just what he says he did not) and did not agree to dedicate any part of the 3.55 acres for either road or recreation (actually he did promise to provide a six-acre recreation area if the twenty-four acre tract he also owned was rezoned and since the rezoning has never been granted he never did provide it).

In any event, Gingery continued to try to persuade the City to annex his land. Mayor Greene testified that Gingery made many calls and visits because he was concerned that the City would either annex the 3.55 acres with a zoning status of R-S or that it would not act at all, and that Gingery "was well aware of the reticence we had to merely bring this property in without adequate provision for the recreational needs of those four hundred units of property * * *." Gingery's argument continued to be that he "simply couldn't live with having the two acres taken out of his development [out of the 3.55 acres]." Finally, after Mayor Greene had walked over the property, he and Gingery had further conversations and Gingery agreed he would see if he could acquire a recreational area from a neighboring owner and that "he wanted us [the City] to move very quickly" because he would get the land for the recreational area. Mayor Greene told him, in answer to his direct question, that the Rockville Council would want the recreational land in hand or hard assurance it would be soon provided. Gingery suggested to Greene that if he, Gingery, could not buy the neighboring land by a certain date "he would be glad to put up enough dough, which was equivalent to the cost of obtaining the land, in an escrow account, so * * * the city could move using its powers of eminent domain to acquire the property * * *." Greene replied that this sounded like a good idea and to take it up with "the staff" and present it to the Mayor and Council. His recollection was that thereafter "the discussions were between Mr. Gingery and his attorney and the staff of the City

until it was presented to the Mayor and Council and the agreement was entered into."

On December 18, 1961, the City Manager wrote the Mayor and Council that on that morning Gingery had conferred with the City Manager, the City Attorney, the Director of Public Works and the Director of Planning "to resolve, if possible, the remaining questions concerning the pending annexation and zoning of the 3.55 acre tract at the rear of Court House Square Apartments * * * [and that] all except one of the open issues was resolved * * *." The tentative agreements arrived at were:

"1. Mr. Gingery will set aside areas for recreation to be used by residents of Court House Square Apartments, as shown on the sketch plan prepared by the Department of Planning and Urban Renewal, and reviewed by the Council at its last meeting.

"2. Mr. Gingery will enter into a written agreement that not later than February 1, 1963 the realigned right-of-way of West Edmonston Drive will be deeded by him to the City in lieu of the existing right-of-way, and the City will deed back to him the old right-of-way for use as a recreation area. (This was agreed to because an immediate conveyance of these properties would be extremely costly to Mr. Gingery on account of his current mortgage release terms, and because it is extremely unlikely that the City would need the right-of-way prior to February 1, 1963.)

"3. Mr. Gingery will attempt to acquire for recreation purposes the area between the rear lot line of the Court House Square parcel and the northerly boundary of East Jefferson Street, from West Edmonston Drive to the point at which the property line of his parcel departs on an angle from Jefferson Street. In the event of his failure to obtain this parcel by voluntary sale prior to July 1, 1962, he is to pay to the City the sum of $10,000 as follows:

$3,000 on July 1, 1962     $3,000 on June 1, 1964
$3,000 on June 1, 1963     $1,000 on June 1, 1965

The City is to use the proceeds of this fund to acquire the tract in question by voluntary sale or condemnation. If Mr. Gingery acquires it through voluntary sale, it is to be used as a private recreation area; if the City is required to acquire it, it will be a public recreation area. (The installment provisions were agreed to on the basis of Mr. Gingery's statement that they had previously been conveyed to Mayor Greene.)

"4. The Mayor and Council will act to annex the 3.55 acre tract.

"5. The two recreation areas to be set aside out of property owned by Mr. Gingery's corporation at the present time are to be developed substantially in accordance with the plan submitted by him and entitled 'Proposed Playground Layout—November 1961', prepared by Joseph P. Kondis, Landscape Architect.

The question left unresolved by the staff in its discussion with Mr. Gingery related to the density of the 3.55 acre tract. Mr. Gingery indicated to the staff that unless he could develop this tract at the same density at which the balance of the tract had been developed, he would not be interested in an agreement of the type proposed. This matter was therefore left for resolution between him and the Council. Should the tentative agreement outlined above be satisfactory to the Council, and should it be possible to resolve this one remaining issue, the staff would recommend that the City Attorney be directed to prepare a written agreement embodying these terms, for execution by the parties concerned."

On January 15, 1962, Gingery wrote the Mayor and Council as follows:

"We enclose herewith an agreement dated January 15, 1962 between the Mayor and Council of Rockville and the undersigned pertaining to the above referenced

property. It is our understanding that you will retain this agreement in your possession until we are permitted to go ahead with 100 apartment units on the annexed land referred to in the agreement. Upon receipt of the use and building permits, this agreement shall be considered delivered. It is entirely satisfactory to us and our attorneys for you to be the depositary for this agreement.

"We have rewritten the agreement to make the minor changes I discussed with you on the phone on Saturday.

"If you will notice in paragraph 3, we took out the clause wherein the City agreed to convey a certain right-of-way on Edmonston Drive. The reason for deleting this paragraph is that this right-of-way has never been deeded to the City by Brookeville Turnpike Construction Company because we were set to transfer this deed until the construction loan on Section 2 became a permanent loan.

"Our attorneys, Wheeler, Korpeck & Clark, have not examined this agreement, but will do so on Tuesday, January 16, 1962. Although on the face of it via phone conversation, it appeared to them to be okay as corrected. I leave this matter in your hands for completion, and I assume that this is satisfactory.

"I would like to take this opportunity to thank you for your kind cooperation in this matter."

It is conceded that the agreement as executed and forwarded by Gingery became effective and that the City duly annexed the 3.55 acres on January 22, 1962. No question was raised below and none is raised here as to the mechanical or procedural aspects of the City's powers, legislative or contractual, or as to the manner or mode of their exercise. What is challenged is the legal power of the City to do what it did, not how it proceeded to do it, and the legality and effectiveness of the contract, not its form or execution.

The extension of the boundaries of a municipality is a political matter to be regulated by the constitution or the legislature of the State. Customarily, the power to annex is delegated

to the city or town by statute, since those political entities have no inherent powers to add to their size. 2 McQuillin, *Municipal Corporations,* §§ 7:10 and 7:13 (3d Ed.). The Maryland Legislature has provided in Code (1957), Art. 23A, § 19, for the power to annex and the manner of exercising that power. Every municipal corporation may annex contiguous land not within the boundaries of another municipality, either on the initiative of the city or town or of the residents of the area, including, if less than twenty people live in the area proposed to be annexed, any person, firm or corporation. In every case the residents or the person, firm or corporation have a final veto by way of a referendum election. Section 19 (a) makes it plain that the grant of power to annex is permissive only and not mandatory. It reads:

> *"Legislative body authorized to enlarge corporate boundaries.*—The legislative body, by whatever name known, of every municipal corporation in this State may enlarge the corporate boundaries thereof as in this subheading provided; but this power shall apply only as to land which is contiguous and adjoining to the existing corporate area."

There was no common law right to compel annexation. *Scheuer v. Johns-Manville Products Corp.* (Ill. App.), 70 N. E. 2d 876, 880, and the Legislature did not give the inhabitants or owners of an area contiguous to a municipal corporation that right. They can seek annexation and forbid annexation but they cannot compel it. The option is that of the municipal corporation.

Since a municipality may or may not annex as the exercise of its honest judgment dictates, it seems only logical that it may, as prerequisites to granting annexation, impose reasonable, bona fide conditions for the public good and public welfare if they are related to the area to be annexed and nearby areas. This view was taken recently by the Supreme Court of Colorado in *City of Colorado Springs v. Kitty Hawk Develop. Co.,* 392 P. 2d 467, 471, *appeal dismissed and cert. denied,* 379 U. S. 647. There the plaintiff desired to use city utilities to develop land outside the city limits. The city would not agree to furnish the

utilities unless the land were annexed and the developer complied with ordinances regarding land to be annexed requiring the setting aside of eight per cent of the land for public purposes or the payment of eight per cent of the value of the land to a special city fund for use in the acquisition of substitute public lands. The developer paid the city some $25,000 and then, when he got what he had bargained for, sued to recover the payment, alleging that its exaction was unconstitutional and illegal. The Court denied him relief. It rejected the argument relied on by the Chancellor below that this was a contract made for the purpose of unduly controlling or affecting official conduct and so opposed to public policy, reasoning that "no governmental power was bargained for here, nor was any constitutional right surrendered," because the developer had no constitutional or statutory right to compel annexation and the resulting utility services. The Court went on to say:

> "We find nothing in the general law of this state or in the Constitution prohibiting the imposition of conditions by a municipality upon one seeking annexation. A municipality is under no legal obligation in the first instance to annex contiguous territory, and may reject a petition for annexation for no reason at all. It follows then that if the municipality elects to accept such territory solely as a matter of its discretion, it may impose such conditions by way of agreement as it sees fit. If the party seeking annexation does not wish to annex under the conditions imposed, he is free to withdraw his petition to annex and remain without the city. Annexation can take place only when the minds of the city and the owners of the land contiguous to the city agree that the property shall be annexed and upon the terms upon which such annexation can be accomplished." (392 P. 2d at 472)

See also *Schlarb v. North Suburban Sanitation District* (Colo.), 357 P. 2d 647. We find the *Kitty Hawk* decision to be sound and persuasive and in harmony with the decisions of this Court in analogous matters. In *County Council v. Lee*, 219 Md. 209, the Public Works Department of Montgomery County issued

a developer a permit to pave a road through his project specifically conditioned on his acquiring an easement for a storm drain. The owner of the property which was to become subject to the easement would not sell, at least not for the price the developer was willing to pay. The developer then indicated he had never intended to do more than what was "within his ability" and sued to enjoin the foreclosure of his performance bond, and for a declaration of rights. The Court held that the county could lawfully impose conditions on the granting of the permit even if those conditions were not specifically prescribed or authorized by statute. Judge Horney, for the Court, said (at pg. 215 of 219 Md.) :

> "Thus, the real question, as we see it, is whether the County had authority to prescribe the terms and conditions it imposed before it consented to grant permission for the paving of Galena Road. We think it is clear that it did."

We found the condition imposed to be a reasonable and valid exercise of the County's police power and that "the right to grant or withhold its permission for the paving of Galena Road carries with it the right to prescribe reasonable terms and conditions upon which the permit would issue other than those specifically prescribed by § 93-15 * * *."

In *Krieger v. Planning Commission,* 224 Md. 320, the Commission refused to approve a subdivision plat because it did not meet its requirements as to the width of roads, proper vehicular access and size of lots. The developer argued that the refusal was illegal and arbitrary and deprived him of his property without due process. This Court found no indication of bad faith, no taking and no abuse of discretion in properly exercising the police power. Judge Henderson, for the Court, said (224 Md. at 324) :

> "Other courts have reached the conclusion that planning requirements under which developers record plats and obtain approval of roads and strips bordering on roads are within the police power and not compensable. See *Newton v. American Sec. Co.,* 148 S. W.

> 2d 311 (Ark.); *Ridgefield Land Co. v. City of De-
> troit,* 217 N. W. 58 (Mich.); *Ayres v. City Council
> of City of Los Angeles,* 207 P. 2d 1 (Cal.); *Bringle
> v. Board of Supervisors of County of Orange,* 351 P.
> 2d 765 (Cal.); cf. *Rosen v. Village of Downers Grove,*
> 167 N. E. 2d 230, 233 (Ill.). See also the cases in 11
> A. L. R. 2d 524."

See also *Baltimore v. Steam Packet Co.,* 164 Md. 284, 289.

In the *Ayres* case, cited in *Krieger* above, the Supreme Court of California, in Bank, held that absent a specific limitation on the power of a city to impose conditions in approving a subdivision map, conditions which were imposed (that there be dedicated a ten-foot strip for widening a boulevard, that another ten-foot strip in the rear of the lots be restricted to the planting of trees and shrubbery to prevent direct access between the lots and a boulevard, that an extension of a street be dedicated to a width of eighty feet rather than sixty feet and that an area covered by the extension of another street be dedicated for street use) should be deemed lawful if not inconsistent with any ordinance and if reasonably required by the subdivision type and use as related to the neighborhood.

The developer in the case before us argues that the correct law is that of cases such as *Haugen v. Gleason* (Ore., En Banc), 359 P. 2d 108; *Kelber v. City of Upland* (Cal. Ct. App.), 318 P. 2d 561; and *Rosen v. Village of Downers Grove* (Ill.), 167 N. E. 2d 230, where subdividers of land were required to pay so many dollars a lot for approval of their subdivision plans and the money, although earmarked for public use, was not necessarily to be used in the subdivision involved directly or indirectly, or was not computed on the basis of subdivision needs. The Court in *Haugen* said this could not be approved because it was not an exercise of the police power but a tax on one class of landowners for a public purpose which may be, but need not be, related to the activity being regulated. It said (at p. 111 of 359 P. 2d): "The regulation cannot stand because it fails to limit the use of the money so produced to the direct benefit of the regulated subdivision." *Kelber* condemned such fund raising because it was not to be used for the

needs of the area and so was not reasonably related to the subdivision making the payment. *Rosen* said it is permissible to require a developer to dedicate or alternatively to pay the costs of streets and public areas "which are specifically and uniquely attributable to his activity and which would otherwise be cast upon the public," but it is not permissible if the funds are to be used for general public purposes.

This Court reached the same conclusion in *Baltimore County v. Security Mtge.*, 227 Md. 234, where we held that a developer could not, in the absence of express or implied statutory authority, be required as a prerequisite to approval of a subdivision plat, to defray the cost of improvements which are on land beyond the development and owned by others. See, however, *Gerczak v. Todd*, 233 Md. 25, 27-28, where this Court agreed with the rule in the *Security Mtge.* case but said that merely because the zoning authorities cannot require a builder to defray the cost of public improvements beyond the boundaries of his own property, "this does not mean that the developer may not validly contract to do so."

The cases relied on by Gingery are to be distinguished from the case before us. Here Rockville reasonably, fairly and in good faith could have determined that the dedication of Edmonston Drive and of a recreational area were required by Gingery's apartment house project and were closely related to it and to be used by those in it, as in *Lee* and *Krieger*.

We find no merit in the claim that the contract before us was the result of duress which makes it invalid. The earlier recital of the facts makes it plain that Gingery knew before he started his development that Rockville would require a dedication for Edmonston Drive and for recreational areas. A fair reading of the evidence discloses further that Gingery knowingly and voluntarily went ahead with the development within the City and attempted later to secure annexation of the acreage outside the City by suggesting or intimating dedications and recreational areas that he would not bindingly promise to make or create in the hope the City would accept less than assured performance. He negotiated at arm's length, on a friendly basis, until the very moment he signed the final agreement. Even then he made the delivery of the signed agreement depend

on his being allowed the density of population on the 3.55 acres he had fought for all along. The City was fair and open with Gingery in its unfailing insistence on its conditions for annexation. No doubt Gingery understood the City's position for he had been on the Planning Commission of Montgomery County for fifteen years and was fully knowledgeable as to zoning and governmental ways and practices, and whatever bind he found himself in was of his own making. There was no evidence of the economic duress he claims. See *Gregory Manor v. City of Clifton* (Super. Ct. N. J.), 147 A. 2d 595; *Montauk Corp. v. Seeds,* 215 Md. 491, 501-02.

Gingery suggests that the exaction of the conditions for annexation constituted illegal and forbidden contract zoning. It is clear that one seeking annexation may require a particular zoning classification as a condition of his agreeing finally to annexation, *Beshore v. Town of Bel Air,* 237 Md. 398, 416; *Tanner v. City of Boulder* (Colo.), 405 P. 2d 939, 941-42, and this is what Gingery did. He insisted on R-20 zoning. The conditions the City insisted on were prerequisite to annexing, not to rezoning, as to which there was no significant controversy, and the fact that an agreed upon zoning classification would accompany the annexation as a condition of the annexee does not bring the rezoning within the Maryland rule that rezoning cannot be granted conditionally.

There was no lack of mutuality in the contract either of obligation or of remedy. Rockville could have been required to annex the land it agreed to annex had it failed to do so. Specific performance was required of Harford County which had failed to improve a road it had obligated itself to improve in *Board of County Comm. v. MacPhail,* 214 Md. 192, and of Baltimore County in a similar obligation in *Cohen v. Baltimore County,* 229 Md. 519. In any event since Rockville has fulfilled its promise to annex the land, it does not lie in Gingery's mouth now to claim lack of mutuality of remedy, a doctrine which of late has been severely criticized. See *Stamatiades v. Merit Music,* 210 Md. 597, 605-15; *Ligget Co. v. Rose,* 152 Md. 146, 154.

Since we have found the contract sued on to have been legal, fair, reasonable and certain it comes within the rule that it is as much a matter of course for an equity court to decree its

specific performance as it would be for a law court to award damages for its breach, and that in such a case it is the duty of the court to enter the decree. *Md. City Realty v. Vogts,* 238 Md. 290, 302; *Pollin v. Perkins,* 223 Md. 532, 544; *Perlmutter v. Bacas,* 219 Md. 406, 411-12.

The Chancellor ordered the City to repay Gingery the $3,000 installment due July 1, 1962, which he paid the City in October of that year under "protest" because, he says, the City would not turn on the gas for his apartments unless he did (the "protest" written on the check was that the payment would be returned to him if he was able to buy the neighboring land for the recreational area). Whatever the fact, the view we have taken of the contract requires that this part of the decree appealed from also be reversed, since the payment was called for under Gingery's valid agreement.

> *Decree reversed, with costs, and case remanded for entry of a decree conforming to this opinion.*

BARNES, J., dissenting:

I dissent because, in my opinion, (1) the power to *contract* for annexation was never delegated by the General Assembly of Maryland to the Mayor and Council of Rockville (Rockville); and that, in the absence of such delegation, the contract was nugatory; (2) assuming, *arguendo,* that such a power was delegated, it was not properly exercised by Rockville pursuant to Code (1957), Art. 23A, sec. 19; (3) the purported contract of January 15, 1962 was illegal, null and void in that (a) it was an illegal attempt by Rockville to exercise or fetter its legislative power by contract, (b) it denied due process of law as being unreasonable, and as resulting from arbitrary and capricious action by the officials of Rockville, and (c) the Chancellor was not clearly erroneous in finding from the evidence that the purported contract was unconscionable and was unenforceable in a court of equity by specific performance.

(1) Delegation of Power to Contract for Annexation

It is clear that the General Assembly of Maryland has the power to alter, establish and extend the boundaries of munici-

palities and, *in the absence of constitutional limitations,* this power is plenary and unlimited. *McGraw v. Merryman,* 133 Md. 247, 104 Atl. 540 (1918). *Daly v. Morgan,* 69 Md. 460, 16 Atl. 287 (1888). In *McGraw* our predecessors found no constitutional barrier to the extension by the General Assembly of the city limits of Baltimore City by including parts of Baltimore County and Anne Arundel County without providing for a referendum of the legal voters in the annexed areas.[1]

The power of annexation may be delegated by the General Assembly to the municipalities of the State and this has been done by Code (1957), Art. 23A, sec. 19. The delegation of the power of annexation to the municipal corporations of the State is not full and complete, but is limited by the provisions of the statute.

Subparagraph (a) of Section 19 provides:

"The legislative body, by whatever name known, of every municipal corporation in this State may enlarge the corporate boundaries thereof *as in this subheading provided;* but this power shall apply only as to land which is contiguous and adjoining to the existing corporate area." (Emphasis supplied).

It is apparent from the provisions of subparagraph (a) that the power delegated by the General Assembly was not coincident to its own powers. The remaining subsections of Section 19 limit the exercise by the municipal corporation of the delegated power to annex contiguous land.

Subsection (b) provides that a proposal for change may be initiated by resolutions regularly introduced into the legislative body of the municipal corporation, "in accordance with the usual requirements and practices applicable to its legislative enactments, and also in conformity with the several requirements

---

1. In 1947 an amendment to Art. 13, § 1 of the Constitution of Maryland imposed a requirement that the lines of no county nor of Baltimore City should be changed "without the consent of a majority of the legal voters residing v ithin the district, which under said proposed change, would form a part of a county or Baltimore City different from that to which it belonged prior to said change * * *."

contained in subsections (b) and (c) of Section 13 of this sub-title" (the subsection in regard to amendments of municipal charters [2]). It further provides that the consent for the proposal must be obtained from not less than 25% of the persons residing in the area to be annexed and who are registered voters in the county election *and* from the owners of not less than 25% of the assessed valuation of the real property located in the area to be annexed. It is then provided:

> "The resolution *shall* describe by a survey of courses and distances, and *may* also describe by landmarks and other well-known terms, the exact area proposed to be included in the change, and *shall contain complete and detailed provisions as to the conditions and circumstances applicable to the change in boundaries and to the residents and property within the area to be annexed.*" (Emphasis supplied).

Subsection (c) provides for the initiation of a proposal for annexation by a petition of 25% of the resident registered voters and of the owners of 25% of the assessed valuation of the real property located in the area to be annexed. Upon presentation of such a petition the presiding officer of the legislative body is required to verify the signatures of the required petitioners and upon such verification "the presiding officer of the legislative body *shall promptly cause to be introduced* therein a resolution proposing the change of boundaries as requested by the petition. The resolution in form and content *shall conform* to the requirements of this section." (Emphasis supplied).

Subsection (d) requires that notice be given and a public hearing be held in accordance with the notice given. The chief executive and administrative officer of the municipal corporation *"shall* cause a public notice thereof to be published not fewer than four times at not less than weekly intervals in a newspaper * * * of general circulation in the municipal corporation and the area to be annexed, *briefly and accurately de-*

---

**2.** Subsection (a) of §13 requires that the resolution shall contain the complete and exact terms of the proposed amendment and subsection (c) requires that the resolution contain but one subject and that shall be described in its title.

*scribing* the proposed change and *the conditions and circumstances applicable* thereto. The public notices *shall* specify a time and place at which a public hearing will be held by the legislative body on the resolution;" this hearing *"shall* be set for not less than fifteen (15) days after the fourth publication of the notices and *shall* be held either within the boundaries of the municipal corporation or within the area to be annexed." (Emphasis supplied).

Subsection (e) provides that after the public hearing, the legislative body may proceed to enact the resolution "in accordance with the usual requirements and practices applicable to its legislative enactments" and the resolution *"shall* not become effective" until at least 45 days following its enactment.

Subsequent subsections provide for a referendum by not less than 20% of the resident registered voters in the area to be annexed, or by not less than 20% of the qualified voters of the municipal corporation, as well as for the time of the referendum, notice, form of ballots and other similar provisions. Subsection (1) prohibits the annexation of land within the corporate limits of another municipal corporation.

It is entirely certain that no power is expressly granted by the General Assembly to municipal corporations to make contracts with land owners in proposed areas to be annexed to dedicate land, pay money or provide for other considerations to induce the municipal corporation to enact a resolution for the proposed annexation. Can such an extraordinary power be implied? I think not.

The rule is well established in Maryland that municipal corporations have only such powers as the General Assembly confers upon them and the powers delegated are to be strictly construed.

As Judge Johnson, for the Court, stated in *Hanlon v. Levin,* 168 Md. 674, 677, 179 Atl. 286 (1935) :

> "[M]unicipal corporations have only such powers as have been conferred upon them by the Legislature, and these are to be strictly construed. To doubt such power in a given case is to deny its existence. *Rushe v. Hyattsville,* 116 Md. 122, 81 A. 278; *Heiskell v.*

*Baltimore,* 65 Md. 125, 4 A. 116; *Baltimore v. Gill,* 31 Md. 375; *St. Mary's Industrial School v. Brown,* 45 Md. 310."

In *Hanlon,* this Court held that the Board of Park Commissioners of Baltimore City had no power to lease for a radio broadcasting station property acquired by the city which had become part of the city parks, and that the Mayor and City Council of Baltimore, itself, had no power to enter such a lease even when the land to be leased was no longer needed for a public use without complying with its charter provisions in regard to newspaper advertisement and without embodying the lease in an ordinance to be referred by the City Council to the Board of Estimates for investigation and report. *Hanlon* has been cited with approval and its summary of the Maryland law above quoted was again approved in *Mayor & City Council of Baltimore v. Canton Co. of Baltimore City,* 186 Md. 618, 631, 47 A. 2d 775 (1946); *Duvall v. Lacy,* 195 Md. 138, 143, 73 A. 2d 26 (1950); *Mayor & Council of Mount Airy v. Sappington,* 195 Md. 259, 263, 73 A. 2d 449 (1950).

Annexation most surely *can* readily be accomplished without the making of a contract with the owners of land in the annexed area for the dedication of land and payment of money to the annexing municipality. The annexations of 1918 and of 1888, of additional areas to Baltimore City were accomplished without such contracts. See *McGraw v. Merryman, supra* and *Daly v. Morgan, supra.* It is not a necessary incident to the exercise of the express power to annex to imply the power to *make a contract* with the owners of land in the annexed area to dedicate land or pay money to the annexing municipality to induce the annexation. On the contrary, it would be, in my opinion, unreasonable and even contrary to the public interest to imply such a power.

As will later be developed in more detail, the great weight of authority in this country supports the doctrine that contracts to exercise or not to exercise governmental power by municipalities are against public policy and, therefore, null and void. It is apparent that the courts should not imply a power the exercise of which reaches a result which is against public policy.

We have held that the provisions of Articles 23A and 66B of the Maryland Code in regard to annexation and zoning, respectively, should be read together. As Judge (now Chief Judge) Hammond said, for the Court, in *Mayor & Aldermen of City of Annapolis v. Kramer*, 235 Md. 231, 234, 201 A. 2d 333 (1964):

> "It would appear that the provisions on the same subject matter of Articles 23A and 66B of the Code must be read together and be applied when a municipality zones for the first time in the course of annexing land."

We cited *Kramer* with approval and applied the language above quoted in *Beshore v. Town of Bel Air*, 237 Md. 398, 206 A. 2d 678 (1965). *Beshore* involved a resolution of the Town of Bel Air to annex approximately 68 acres of contiguous land. The resolution also rezoned the annexed area. In contending that the resolution was invalid because it combined both annexation and rezoning in one resolution, the complaining taxpayers asserted, *inter alia*, not only that the annexation and rezoning could not be combined in one resolution but, if they could, the rezoning was included in the resolution by reason of an agreement with the owners of the annexed area. We held that since the subject matter of the provisions of Articles 23A and 66B was the same, they should be construed together (following *Kramer, supra*) and further that there was no evidence either in the resolution or otherwise, that there was any agreement between the property owners of the annexed area and the municipality so that our prior holdings considering zoning by contract were not applicable. Judge Sybert, for the Court, indicated that such prior decisions holding contract zoning to be invalid would have been applicable, if there were in fact such a contract. However, the question as to whether the rule against contract zoning was applicable to initial zoning of newly annexed property was left undecided by the Court.

It is clear to me that our prior decisions holding that agreements for rezoning between a land owner and a municipality are invalid are applicable to the initial zoning of newly annexed

land and, further, that the principle of those cases is equally applicable to the exercise of the power of annexation, itself.

*Baylis v. Mayor & City Council of Baltimore,* 219 Md. 164, 148 A. 2d 429 (1959), "squarely presented for the first time" the issue of whether the City of Baltimore had the power to condition the rezoning of land upon the execution of an agreement with the owner of that land. In *Baylis* (contrary to the situation in the present case) the agreement was set forth in full in the rezoning ordinance. This Court held that the ordinance and agreement were null and void. The Court, in addition to reliance upon the theory that such contracts would destroy the uniformity of districts required by Code, Article 66B, sec. 2, also relied upon the well established doctrine that the contract was "nugatory because a municipality is not able to make agreements which inhibit its police powers." Judge Henderson, for the Court, in *Baylis* pointed out that the decision in that case had been foreshadowed by the statement of Judge Hammond in his opinion for the Court in *Wakefield v. Kraft,* 202 Md. 136, 149-50, 96 A. 2d 27 (1953), as follows:

> "The County Commissioners are not a Planning Board, nor have they the right to exact conditions, or provisions of a particular use in return for deciding that the public interest justified that an area should be zoned commercial."

For a full discussion of "contract zoning" see Rathkopf, *The Law of Zoning and Planning* (3rd Ed.) Ch. 74:6-23. The substantial weight of authority apparently supports our decision in *Baylis.*

We have cited *Baylis* with approval and followed its holding in *Rose v. Paape,* 221 Md. 369, 157 A. 2d 618 (1960); *Carole Highlands Citizens Ass'n., Inc. v. Board of County Commissioners of Prince George's County,* 222 Md. 44, 158 A. 2d 663 (1960); and *Pressman v. Mayor & City Council of Baltimore,* 222 Md. 330, 160 A. 2d 379 (1960). The doctrine of *Baylis* is now well established in the law of Maryland. See Trager, *Contract Zoning,* 23 Md. L. Rev. 121 (1963).

If contracts between property owners and municipalities to rezone are invalid, *a fortiori,* similar contracts to induce annexation are invalid. Not only have we already held that the

provisions of Articles 23A and 66B are *in pari materia* and are to be construed together (*Kramer* and *Beshore, supra*), but there is far more reason, in my opinion, to permit contract rezoning than there is to permit contract annexation. In zoning the power of the municipality to make special exceptions and to grant variances is specifically given by the Enabling Act and it is contemplated that individual adjustments and variations are necessary and proper for a smooth and just application of the zoning laws. No such power is given or contemplated by Article 23A, sec. 19, regarding annexation. There is no suggestion in section 19 that there should be special exceptions or variances in annexing land. It might well be that a Court could sustain contract zoning as a practical equivalent to a special exception or variance,[3] but decline to sustain contract annexation.

In the present case, the annexation resolution and the rezoning ordinance were all part of the same "package deal." Although the form of two separate ordinances was faithfully maintained, it is clear from the evidence that Brookeville could not practically carry out the project without the passage of both ordinances. The Planning Commission reported separately on both annexation and rezoning on the same day, January 12, 1961. The Commission had no objection whatever to the annexation resolution and recommended its passage by the City Council, without qualification or condition. In regard to the rezoning ordinance it recommended a "temporary" rezoning to R-S pending its investigation of recreational uses. In short, there was no objection or contrary evidence whatsoever to the annexation resolution; delayed action was recommended by the Planning Commission on the rezoning to R-20 and this recommendation *resulted in the delay on both ordinances.* It was to overcome this objection to the rezoning to R-A and to obtain favorable action on both the annexation resolution and the companion ordinance rezoning the 3.55 acre tract to R-A, that the contract of January 15, 1962 was negotiated and executed by the parties.

Favorable action on the rezoning ordinance is carefully left

---

3. See Church v. Town of Islip, 8 App. Div. 2d 962, 190 N. Y. S. 2d 927 (1959), aff'd., 8 N. Y. 2d 254, 203 N. Y. S. 2d 866, 168 N. E. 2d 680 (1960).

out of the contract, but, obviously there was the tacit understanding that favorable rezoning action was an essential part of the consideration for the contract. When the contract was executed, such favorable action followed forthwith. It is clear to me that this presents a case of contract rezoning and the doctrine set forth in *Baylis* applies. The present case is to be distinguished from *Pressman* where an illegal contract was made with *the Planning Commission* to obtain *its* approval of the proposed rezoning ordinance, but there was no contract with the City of Baltimore itself and no contract was mentioned in the rezoning ordinance. In the case at bar, the contract is made directly with Rockville and it definitely caused the favorable passage of the rezoning ordinance.

The majority opinion relies upon the decision of the Supreme Court of Colorado in *City of Colorado Springs v. Kitty Hawk Develop. Co.*, 154 Colo. 535, 392 P. 2d 467 (1964), cert. denied, 379 U. S. 647 (1965) and states:

> "Since a municipality may or may not annex as the exercise of its honest judgment dictates, it seems only logical that it may, as prerequisite to granting annexation, impose reasonable, bona fide conditions for the public good and public welfare if they are related to the area to be annexed and nearby areas."

As I see it, a far different problem is presented by the case at bar. The issue in the present case is whether the municipality *may lawfully contract* with a property owner to annex that property owner's land upon the dedication of a part of the land to be annexed to public use and the payment of a substantial sum of money to the municipality if land not in the area to be annexed is not acquired by the property owners and put to a particular use. In the present case there is no *prior ordinance* of Rockville setting up a uniform condition for all annexations as was the situation in *Kitty Hawk*. On the contrary, the purported contract in the case at bar was "negotiated" on an *ad hoc* basis. Indeed, as will be more fully developed later, even this purported contract was never made a part of the resolution for annexation, and it has never been approved by an ordinance or resolution by Rockville.

Our predecessors in *Schriver v. Mayor & City Council of Cumberland,* 169 Md. 286, 288-89, 181 Atl. 443 (1935) clearly indicated that promises of public officials in regard to the extension of facilities in an area to be annexed to induce approval by the voters of the proposed annexation, but not contained in the apposite statutes, could not be enforced or recognized by the Courts.

Chief Judge Bond stated:

> "The petitioners consider, however, that extension of the supply into their district was assured by promises made to obtain votes for approval of the annexation, and in understandings, by the municipal officials and the assembly at the time of passage of the acts, that the extension should be made, and made forthwith, by means of the money from sale of the bonds. But such promises or understandings could not serve as sources of legal rights and obligations, added to the actual provisions of the statutes. In ascertaining the rights and obligations of the parties, the courts are confined to the statutes passed to create them, and promises or understandings not made law by inclusion in the statutes have no existence that the courts can recognize. *Smith v. State,* 66 Md. 215, 217, 7 A. 49; *Riggin v. Wyatt,* 139 Md. 476, 478, 115 A. 755."

The holding in *Kitty Hawk* does not, in my opinion, support the holding by the majority that *the purported contract* is valid and lawful.

It should be observed that the decision by the majority of the Supreme Court of Colorado in *Kitty Hawk* in sustaining in that State the delegation of power to the municipality to provide by ordinance for a condition applicable to annexations may well be incorrect. See the vigorous dissenting opinion of Justice Moore, 392 P. 2d 473, *et seq.* Cf. *Denver v. Denver Buick, Inc.,* 141 Colo. 121, 347 P. 2d 919 (1959). The decision of the majority in *Kitty Hawk* appears to represent a minority position. See, e.g., *Pioneer Trust and Savings Bank v. Village of Mount Prospect,* 22 Ill.2d 375, 176 N. E. 2d 799 (1961); *Miller v. City of Beaver Falls,* 368 Pa. 189, 82 A. 2d 34 (1951).

In my opinion, the holding of the Court in *County Council for Montgomery County v. Lee,* 219 Md. 209, 148 A. 2d 568 (1959) does not support the holding in the majority opinion in this case. In *Lee,* the General Assembly had granted to chartered counties, complete jurisdiction over streets and roads, including the power to regulate the opening of street surfaces and the location, construction, repair and use of streets and highways. The chartered counties were given power to enact local laws "providing appropriate administration * * * remedies and sanctions for the administration and enforcement of such ordinances * * *." See Code (1957), Article 25A, sec. 5 (K) and (T). Pursuant to this grant of power, Montgomery County—a chartered county—adopted a County Code in which one section provided that the total cost of roads and streets constructed by the county for public use, including rights-of-way and easements would be paid by the county but that the *entire initial cost* of grading and constructing roads and streets for the benefit of individual and corporate taxpayers must be borne by them when the permit to them is issued. The applicant for such a permit was required to post a performance bond in the amount of the estimated *total cost of the project.* The permit, however, could not issue unless the right-of-way had been acquired by the county *or* had been dedicated to public use. The permit in question was granted to an individual taxpayer for his private benefit in the subdivision he was developing and provided that he should "obtain the necessary easement for the construction, operation and maintenance of Outlet W-1". The developer never did supply this right-of-way or easement and the county proceeded against the performance bond. The situation in *Lee* is far different from that presented in the pending case. In *Lee* the entire cost of all street openings and initial constructions for private benefit was imposed upon the developer *by ordinance passed pursuant to the power delegated by the General Assembly* and the condition of the permit merely carried that requirement of the ordinance into effect. In the case at bar not only has no such power been delegated, but no ordinance authorizing the purported contract has ever been passed and the purported contract was not executed pursuant to any prior ordinance.

The same comments are applicable to the other cases cited on this point in the majority opinion.

It is clear to me that the General Assembly never delegated the power to Rockville to make the purported contract in question, either expressly or by implication, and consequently the purported contract is *ultra vires* that municipal corporation and is null, void and of no effect.

### (2) Power Improperly Exercised

If it be assumed, *arguendo*, that the General Assembly did delegate the power to Rockville to make contracts of the type involved in this case, there can be little doubt that this power was not properly exercised by Rockville in accordance with Code (1957), Article 23A, sec. 19.

The provisions of section 19(b) and (c) in regard to what the resolution for the annexation *shall* contain have already been set out in full. There would appear to be no doubt that the contract is a "condition" and "circumstance" applicable to the property within the area to be annexed. Section 19(b) and (c) mandatorily require that the annexation resolution *"shall contain complete and detailed provisions"* as to the "conditions and circumstances" applicable to the property within the annexed area.

The annexation resolution adopted January 22, 1962, completely omitted any reference whatever regarding the contract or its provisions. Mayor Greene was interrogated by the Chancellor as to whether there was any condition included in the annexation resolution and the Mayor replied:

"The agreement was signed; the annexation action was a formal resolution which, I believe, does not include any condition.

"(The Court). Did the agreement have anything to do with the annexation, whether or not it would be granted or rejected?

"(The Witness) Yes it did, sir.

"(The Court) Did the annexation so state?

"(The Witness) No, it did not."

Indeed the annexation resolution, containing no conditions, was introduced into the Council and the public hearing required

by sec. 19(d) took place on the resolution on January 16, 1961, or approximately one year prior to the time the contract was executed on January 15, 1962. This contract was never added to the annexation resolution by amendment so that there was no opportunity for the citizens of Rockville to know of the contract, a condition or circumstance required to be a part of the annexation resolution and thus before the Council at the required public hearing.

If Rockville had the power to make the contract at all, it is clear that this condition or circumstance must be part of the annexation resolution as required by sec. 19(b) and (c). Compliance with these mandatory requirements is a condition precedent to the validity of the contract and Rockville had no power to attempt to enter such a contract contrary to this express provision of the statute. *Hanlon v. Levin, supra.*

The question of the failure to comply with the mandatory provisions of sec. 19 is properly before us even though it was not specifically considered in the opinion of the Chancellor below. The Chancellor decided that the contract was illegal, null and void. The issue of illegality of the contract was raised by Brookeville's answer and, as has been noted, the Chancellor interrogated Mayor Greene in regard to the absence of the contract as a condition in the annexation resolution. The issue of illegality of the contract was, therefore, raised below and decided below. We have affirmed a lower court when its decision was correct but for the wrong reason. See *Bujno v. Montgomery County Commissioners,* 243 Md. 110, 220 A. 2d 126 (1966).

If it be assumed for the argument only that all of the reasons assigned by the Chancellor in holding the contract to be illegal were erroneous, nevertheless, the contract was clearly illegal because of the failure to comply with the mandatory requirements of sec. 19(b) and (c) and the decree declaring the contract to be invalid should be affirmed for this reason. Moreover, Article 23A, sec. 19(e) expressly required Rockville to enact the annexation resolution "in accordance with the usual requirements and practices applicable to its legislative enactments." As will be shown in a later section of this opinion, the annexation procedure followed by Rockville was most unusual and bizarre. And the failure to comply with usual practices

would make the town's action illegal. 62 C.J.S., *Municipal Corporations,* sec. 159, and cases therein noted.

### (3) (a) Contract Is Against Public Policy

The purported contract of January 15, 1962, was, in my opinion, illegal as an attempt by Rockville to exercise or fetter its legislative power by contract. As has already been indicated, the great weight of authority in this country supports the doctrine that contracts to exercise or not to exercise governmental power are void as against public policy. It takes no extended discussion to demonstrate the grave dangers to the public welfare which could result from a holding that such contracts were valid. The exercise of the police power by municipalities could substantially—if not completely—cease or be exercised for the benefit of those persons or groups who were able to make advantageous contracts with municipalities.

The general law is summarized in 43 Am. Jur., *Public Officers,* sec. 295, as follows:

> "An agreement which controls or restricts, or tends or is calculated to control or restrict, the free exercise of a discretion for the public good vested in one acting in a public official capacity is illegal and reprobated by the courts, so that no redress can be given to a party who sues for himself in respect of it. Public officers and boards will not be permitted to make any agreement among themselves, or with others, by which their public action is. to be or may be restrained or embarrassed, or its freedom in any wise affected or impaired. Courts will hold invalid any agreement by governing bodies by which they abdicate any of their legislative powers, or circumscribe the limits of such powers, or diminish their efficiency. Especially will they not be allowed by an obligatory agreement, even for a valuable consideration, to discriminate in favor of one citizen or class of citizens as against another entitled to equality of privilege and benefit. Such agreements are contrary to the true principles upon which society is founded, and subversive of all well-regulated government."

See 63 C.J.S. *Municipal Corporations,* sec. 981(c). See also *Modjeski and Masters v. Pack,* 215 Tenn. 629, 388 S. W. 2d 144 (1965); *Smith v. Ousts,* 214 Ga. 144, 103 S. E. 2d 567 (1958); *Sellers v. Lamb,* 303 Mich. 604, 6 N. W. 2d 911 (1942); *Pippenger v. City of Mishawaka,* 119 Ind. App. 397, 88 N. E. 2d 168 (1949); *San Diego County v. California Water & Tel. Co.,* 30 Cal. 2d 817, 186 P. 2d 124, 175 A.L.R. 747 (1947); *Johnson v. Board of Commissioners of Wake County,* 192 N. C. 561, 135 S. E. 618 (1926); and *McCortle v. Bates,* 29 Ohio St. 419 (1876). Cf. *Westminster Water Co. v. Westminster,* 98 Md. 551, 56 Atl. 990 (1904) declaring a contract purporting to bind the municipality to levy a certain annual tax in perpetuity, *ultra vires,* null and void and as an attempted abdication of its legislative powers, and holding that the abrogation of such a contract did not impair the obligation of a contract as prohibited by the federal constitution. Clearly, the exercise of governmental powers must be free and unfettered except by constitutional or statutory limitations until the final moment of its exercise by those public officers to whose judgment the exercise of that power is delegated by the constitution or by statute. Our predecessors have consistently held that the exercise of the policy powers by legislative bodies can be neither limited by contract nor bartered away by legislation. *Liberto v. Mayor & City Council of Baltimore,* 180 Md. 105, 23 A. 2d 43 (1941). See also *Jones Hollow Ware Company v. State Roads Commission,* 134 Md. 103, 106 Atl. 274, 3 A.L.R. 1658 (1919)—cited with approval and followed in *Liberto*—for a comprehensive review of the prior decisions of this Court and of the cases in the Supreme Court of the United States. The principle has been generally applied throughout the United States. See 16 C.J.S., *Constitutional Law,* sec. 179, especially the many cases collected in Note 58. It has also been applied to the exercise of the power of annexation by municipalities, *Rhodes v. City of Aberdeen,* 74 S. D. 179, 50 N. W. 2d 215 (1951). As was pointed out by our predecessors in *Walsh v. Hibberd,* 122 Md. 168, 173, 89 Atl. 396 (1913)—a case involving a contract between the County Commissioners and a construction firm to induce the opening of a public road—a contract against public policy will be declared void even though

the public does not suffer any injury from the illegal contract. Judge Burke, for the Court, stated:

> "No actual injury resulted to the public from this particular contract, and the parties to it, may be conceded, were not conscious that they were doing a thing which the law did not approve, or would not sanction. The law refuses to enforce a contract which is contrary to public policy, not from any consideration or regard to the defendant; but its refusal 'is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff.'
>
> " 'Where a contract belongs to a class which is reprobated by public policy, it will be declared illegal, though, in that particular instance, no actual injury may have resulted to the public, as the test is the evil tendency of the contract, and not its actual result.' 15 *Am. & Eng. Ency. of Law* (2nd ed.) 934."

After a review of the authorities, Judge Burke further stated:

> "There are stronger reasons for holding that a contract between petitioners for a road and the contractors, which induced the opening of the road, should be void, because the abuses and evil consequences to the public might be much greater."
> (122 Md. at 176, 89 Atl. at 398).

In the present case the record establishes that the annexation resolution was adopted because of the execution of the purported contract of January 15, 1962. Paragraph 4 of the contract specifically provides that "the city agrees to act, insofar as it is permitted by law, to annex the 3.55 acre tract now under consideration * * *." Mayor Greene testified, as has been noted above, that the contract had an effect on whether or not the annexation would be granted or rejected. The contract was intended to bind Rockville to exercise its power of annexation and thus to fetter by contract the exercise of this power. Such an attempt is against public policy and is illegal and void. Such an

illegal contract cannot be specifically performed, and in my opinion, the Chancellor was correct in so holding.

### (3) (b) Contract Is Unreasonable

In my opinion, the purported contract of January 15, 1962 was also unconstitutional as a denial of due process of law contrary to the Fourteenth Amendment to the Constitution of the United States and Article 23 of the Declaration of Rights of the Maryland Constitution, as being unreasonable and as resulting from arbitrary and capricious action on the part of the officials of Rockville.

The owner was required by the contract to purchase three acres of land owned by the Woodmont Country Club and devote it permanently to recreational use. This land is not contiguous to the 3.55 acre tract to be annexed. In the event Brookeville failed to acquire the three acres by July 1, 1962, it agreed to pay the City $10,000 ($15,000 was originally sought) in four installments, the first installment being payable on July 1, 1962, the $10,000 to be used by the City "for the purpose of acquiring and developing additional public recreational area." It will be noted that the location of the additional public recreational area is not specified in the contract so that such an area could be purchased by the City at any location without regard to the 3.55 acres to be annexed.

The memorandum of December 18, 1961, from the City Manager to the Mayor and Council set out in the majority opinion indicates that the $10,000 fund was to acquire by purchase or condemnation the three acres to have been purchased by Brookeville but the *contract* does not so provide. In addition, Brookeville was required by the contract to convey to Rockville 22,534 square feet for the proposed realignment of the City street known as West Edmonston Drive. West Edmonston Drive is not in or even contiguous to the 3.55 acres annexed. The testimony indicated that this land was valued at two dollars a square foot, a total valuation of $45,068. The price to Brookeville under the contract to induce Rockville *"to act"* to annex the 3.55 acre tract was $55,068. The testimony indicated that the cost of the entire tract of 19.05 acres (15.5 acres in Rockville and 3.55 acres outside Rockville) was purchased for approximately $450,000 by Brookeville. This is a per acre price

of approximately $23,600 so that on this basis the cost of the 3.55 acre tract of land was approximately $83,780. The price of getting Rockville to act on the annexation was $55,068 or approximately 65% of the original cost of the land. I consider this grossly unreasonable and in effect confiscatory.

It should be kept in mind that the sewer and water utilities to which the improvements on the 3.55 acre tract would ultimately connect had been installed at the expense of Brookeville. Under the contract Brookeville would pay Rockville approximately $15,510 an acre to act to annex 3.55 acres to the municipality. This is unreasonable on its face. (Compare this enormous demand with the 8% provision in the ordinance involved in *Kitty Hawk*). If the 3.55 acre tract to be annexed were directly affected by the three acre tract or the realignment of West Edmonston Drive or if they were contiguous to the 3.55 acre tract it might possibly be argued—apart from the unreasonable price—that such provisions were "reasonable", but, in my opinion, under the facts in this case such provisions were utterly unreasonable and deny Brookeville due process of law.

The actions of the officials of Rockville, moreover, were arbitrary and capricious. Rockville zoned the 15.5 acres of the 19.05 tract located within the municipality R-20 (from the existing heavy commercial zoning of C-2) on January 19, 1960, without any conditions. Mayor Greene said it was good zoning as did neighboring citizens. The city officials knew that Brookeville had planned the entire 19.05 tract for apartment development as a total plan for 412 to 421 apartment units and that it proceeded to erect apartments on the 15.5 acre portion of the tract rezoned to R-20. By the end of 1961 Brookeville had constructed 314 apartment units on the 15.5 parcel. Parking, sewer, water, utilities and all things necessary for the total development of the whole 19.05 acre tract were installed. The City officials also knew that Brookeville could only connect sewer and water facilities in the 3.55 acre tract through Rockville.

The original site plan for the development of the 19.05 acres was approved by the Rockville Planning Commission and zoning of R-20 for the 3.55 acre tract was recommended in the Master Plan Report of the City of Rockville Planning Com-

mission dated in September 1960. Brookeville filed simultaneous, but separate, petitions for annexation and rezoning of the 3.55 acre tract on November 16, 1960. The annexation resolution and the rezoning application were scheduled for hearing on January 16, 1961 before the City Council. Just four days before the hearing, the Planning Commission of Rockville, on January 12, 1961 by a four to one vote recommended that the 3.55 acre tract be zoned R-S (Suburban Residential instead of R-20 previously recommended) "until the City of Rockville has had an opportunity to investigate whether there is a need to locate a playground on a portion of the subject tract which would serve the immediate area." In this same recommendation, the Planning Commission "notes with concern" that no provision had been made to provide a playground for occupants of the existing and proposed apartments (approximately 410 units) in the area bounded by Rockville Pike on the east, commercial development on the south, Woodmont Country Club on the west and West Edmonston Drive on the north. The recommendation then states:

> "It is the view of the Commission that consideration should be given by the Mayor and Council regarding the need for, and the acquisition of, approximately two (2) acres in size to serve this area, *prior to giving the subject tract a permanent zone classification.*" (Emphasis supplied).

At the January 16, 1961 hearing on the annexation resolution, at which the Director of Planning, Mr. Watts, was present, there was no suggestion that there should be any condition or contract in regard to the annexation. No one spoke in opposition to the annexation. The only testimony given before the City Council of Rockville was that of Mr. Clark, a representative of Brookeville. The annexation hearing was concluded and thereafter a separate hearing on the application to rezone the 3.55 acre tract from C-2 to R-A was held. Mr. Clark presented the case for the applicant, Brookeville. He pointed out that the whole 19.05 acre tract had been planned as a single development and that the Planning Commission of Rockville had "approved the site plan and grading plan, the utilities plan, for the

Courthouse Square Apartment project; that site plan did make, at the time it was approved, the layout for several apartment buildings which were planned to be placed on this 3.55-acre parcel."

A copy of a map appearing in the Master Plan Report of the City of Rockville dated in September 1960, entitled "Proposed Land Use" was introduced into evidence and showed that the 3.55 acre tract had been recommended for R-20 apartment use. Mr. Clark pointed out that the Planning Commission had recommended temporary R-S zoning until the City had an opportunity to study recreational needs for the area. Both he and Mr. Collins testified in regard to the recreational facilities which had been installed in the project which amounted in area to approximately 11% of the land area in the project. Mr. Clark concluded his testimony with the following statement:

"In view of the integral plans of the developer to put all of this together, we would like to have you give it your *early and favorable* consideration, and annex it to the city, rezoning it to the R-20 zoning classification."

No one testified in opposition to the proposed rezoning.

Mr. Gingery, president of Brookeville, pointed out to the City Council the substantial economic loss which would occur if the rezoning of the 3.55 acre tract were delayed but stated "* * * it is entirely within your power just to let it sit. I am, in a way, helpless to do anything about it."

The City Council did, indeed, "let it sit." When no action had been taken on the rezoning ordinance, Mr. Gingery became quite alarmed. The delay was causing him grave economic loss and a failure to pass the rezoning ordinance would result in economic ruin for his company. In July 1961, some seven months after the rezoning hearing, Mr. Gingery had lunch with Mayor Greene and explained his plight. The Mayor suggested the City Council would not take action on the annexation resolution and the rezoning ordinance unless two acres were taken out of the project for recreational facilities in addition to those already installed in the project. Further delay, further conferences with City officials and Council mem-

bers finally resulted in the contract of January 15, 1962. Mayor Greene testified that the "standard" used to demand the three acres was that established by the National Association of Recreation which uses one acre per hundred people. The Report of the National Association of Recreation is not in the record. There was no showing that this was an official publication of any department or agency of the federal government.[4] There was no showing that even this "national standard" would justify the request for three acres (the Planning Commission only recommended *two* acres) and it does not purport to justify a demand for 22,534 square feet for the relocation of a highway.

In my opinion, the actions of the City officials as above described were arbitrary and capricious. There was no *evidence* before the City Council at either the annexation or rezoning hearings which would justify the failure to act for a one year period. The last-minute action by the Planning Commission— four days before the hearings—to recommend a "temporary" zoning of R-S was contrary to the prior approval by the Planning Commission of R-20 for the entire 19.05 acre tract, including the 3.55 acre tract. The Planning Commission knew that Brookeville had proceeded with the development in the 15.5 acre part of the tract in reliance on that prior approval. There is no provision of the Zoning Enabling Act providing for "temporary" zoning. It can only be concluded that this action by the Planning Commission was an invitation to the City Council to delay action on the rezoning application in order to extract two acres of land from Brookeville for additional recreational purposes. This invitation was obviously accepted and indeed, the two acres recommended by the Planning Commission was *increased to three acres and the additional demand* for the 22,534 square feet for the realignment of West Edmonston Drive was added.

As mentioned earlier, sec. 19(e) of Article 23A requires the legislative body to enact the annexation resolution "in accor-

---

4. In fact the National Recreation Association is described in its publication "Standards for Municipal Recreation Areas" by George D. Butler, Revised Edition, 1962 as "a service organization supported by voluntary contributions." Mr. Butler's qualifications are not set forth in the publication.

156

dance with the usual requirements and practices applicable to its legislative enactments." Surely the actions—and failure to act—of the City Council were most extraordinary and unusual and contrary to the usual practice in legislative enactments. Those actions, lacking justification in law, were both contrary to the statute and by the facts arbitrary and capricious. Courts should not permit such bureaucratic excesses. See generally McQuillin, *Municipal Corporations,* secs. 10.27-10.29, 10.37.

### (3) (c) The Chancellor Was Not Clearly Erroneous

As I view the record in this case, the Chancellor was not clearly erroneous in finding from the evidence that the purported contract was unconscionable and was unenforceable in a court of equity by specific performance. Being a suit in equity, the case was tried in the lower court without a jury. This Court will not set aside the judgment of the lower court on the evidence "unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Maryland Rule 886 a.

The Chancellor accepted the testimony of Mr. Gingery, president of Brookeville, that Brookeville was coerced into executing the contract sought to be enforced. Mr. Gingery's testimony is in part uncontradicted and is generally supported by the documentary evidence in the case. He described his situation as follows:

> "The first meeting was held downtown in a restaurant with mayor—Councilman Ecker and Mayor Greene in the middle of the summer. * * * In 1961. This was about seven months after the application been filed, and I explained to them that I wanted— I had been quite alarmed that there had been no action by the mayor and council as promised in their original meeting when they asked me to rezone the property, and that I was—had to make plans, because this was a substantial portion of the project—while it doesn't look like it on the map, it is a very substantial portion, and I had to get moving or I was going to have a winter type opening of the project—that was already apparent—and that I felt that there was no call

for delay; that the delay had already transpired, been acknowledged one way or another, and at that meeting Mayor Greene suggested they weren't going to zone as they agreed to and should be two acres taken out of it for some recreational, although I had plenty of recreation in the project.

"This was a frightful thing to have happen to me, because at that price of land, and cutting down my density to that effect, I already lost eleven units because they wouldn't permit me the density of Edmonston Drive, and if they took off two more acres that was another forty-two units or total of fifty-three units that I wouldn't be allowed to build on the project, and this was not according to our original agreement with the mayor and council and the planning commission at an official meeting. * * *.

"Now, all this meant that I was in serious trouble, from a financial point of view * * *. And ultimately, after a whole year transpired and after I filed my application and been told by the town manager, twice by the mayor, at least three times by the town manager that I had to put up money and dedicate a new location for Edmonston Drive, I thought it was time to pull that application out of there, which I did, had the attorneys do. And that got some action, because they realized that, apparently, that could have been zoned in the county, and that although they could have still held me up by not allowing me to have sewer for that three and a half acre piece of ground. * * *

"I told them, frankly, I didn't think they had any right to do it, but I would agree to do it and try to buy the Woodmont land because, frankly, I was in an awful serious place there, with mud running all over my project I had to move. And even if I got it zoned in the county they had told me they weren't going to give me sewer and water. * * *

"Then with this delay and request for money and request for more land and threats not to zone my two acres, and the threat that if I did take it out of the

town and put it in—and have it zoned in the county, they wouldn't allow me to use the city sewer, in spite of the fact I built it myself at my own expense, I realized I had to sign anything or any agreement that they shoved in front of me or I wouldn't get any zoning, any annexation or, in the contrary, I wouldn't get any sewer if it was zoned within the county. It was just that apparent."

He summarized the reasons he was forced to sign the agreement on behalf of his company:

"First, I was forced to sign the contract under the statement I have made earlier. There was no alternative; you can't fight city hall. They put something in front of you, you got to sign it. I was absolutely bulldozed into doing it by sheer delay. No possible excuse not to hold a hearing on that zoning case for a year.

"Further, when Mr. Scheiber, the City Manager, further threatened me with the full treatment, as he put it, for the cost of the extension of Edmonston Drive and the front foot benefit charge, I realized then that the deeding of this land was only a prelude to some more bulldozing by the city, and I didn't believe that they'd lived up to their original agreement."

There was also testimony that Mayor Greene had stated to Mr. Gingery that he would never get any more zoning from the City of Rockville. This was corroborated by John E. Moore, an architect in Bethesda, who heard the statement. It was not denied by Mayor Greene, although he was available as a witness, having previously testified in the case.

The large and unreasonable amounts of land or money demanded by the officials of Rockville have already been set out and need not be again repeated.

It is not necessary to determine whether the purported contract was obtained by duress, although most certainly elements of duress were present. Cf. *Restatement of Contracts,* Sec. 493 (d). The facts indicate that the contract was indeed uncon-

scionable, unfair, unjust and unreasonable, and an equity court may and should, in my opinion, decline to enforce such a contract by specific performance. As Judge Pattison, for the Court, stated in *Powell v. Moody,* 153 Md. 62, 66, 137 Atl. 477 (1927):

> "It is well settled, in this state and elsewhere, that to maintain a bill for specific performance it is requisite that the agreement which the court is asked to have performed, be fair, just, reasonable, *bona fide,* certain in all its parts, and made upon a good and valuable consideration. If any of these ingredients be wanting, equity will not decree a specific performance. *Griffith v. Frederick County Bank,* 6 G. & J. 424, *Stoddert v. Bowie,* 5 Md. 35; *Gelston v. Sigmund,* 27 Md. 343; *King v. Kaiser,* 126 Md. 217, and numerous other cases."

See also *Beck v. Bernstein,* 198 Md. 244, 81 A. 2d 608 (1951); *Soehnlein v. Pumphrey,* 183 Md. 334, 37 A. 2d 843 (1944); Miller, *Equity Procedure,* §681.

It is also well settled that the granting of specific performance is not a matter of right but rests in the sound discretion of the Chancellor. "The question is not what the court must do, but what it may do under the circumstances; the question is whether the exercise of power of the court is demanded to subserve the ends of justice, for unless the court is satisfied that the application to it is fair, just and reasonable *in every respect,* it refuses to interfere, but leaves the party to other remedies for redress." *Miller, supra,* sec. 656.

Moreover, the contract lacked mutuality in that Rockville was, at the time of the execution of the contract, not legally bound to act on the annexation resolution because such an agreement is null and void as against public policy for the reasons already set forth. The lack of such mutuality is a reason why a Chancellor should decline to grant specific performance. See *Miller, supra,* sec. 685.

Where a contract of a municipal corporation is illegal and against public policy, the other party is not estopped from asserting such defenses against the contract even though he has

received performance under it. To hold otherwise is to give effect to the illegal contract by indirection. As was aptly stated by Judge (later Chief Judge) Sloan, for the Court, in *Anne Arundel County v. Goodman,* 172 Md. 559, 562, 192 Atl. 325 (1937), quoting from *Miller v. U. S.,* 103 F. 413, 416 (Cir. Ct. S.D.N.Y. 1900), "* * * [A] court should be astute not to give effect to such illegal contract by indirection, as by spelling out a waiver or estoppel." See also *Central Transportation Co. v. Pullman's Palace Car Co.,* 139 U. S. 24 (1891) ; 10 McQuillin, *Municipal Corporations* (3rd Ed.) sec. 29.10.

In my opinion, the Chancellor was correct in declining to grant specific performance of the contract. In any event, the Chancellor's action cannot be said to be clearly erroneous and should be affirmed.

I believe the Chancellor also was correct in requiring in the final decree that the payment of $3000 paid by Brookeville on October 29, 1962, in order to have the City turn on the gas for the apartments be repaid by Rockville.

Brookeville declined to pay the installment of $3000 allegedly due on July 1, 1962, under the purported contract, on the ground that the contract was illegal and unenforceable. When cold weather came on and Brookeville requested the City officials to turn on the gas for the apartments, the following transpired, according to Mr. Gingery's uncontradicted testimony :

"A. * * * [W]e asked for a turn on on the gas meters which are required permission by the city to show that all of the plumbing and gas piping has been put in according to the code, and we had such an inspection and the gas sticker was refused. This was getting to be cold weather and I said well, why, I asked my superintendent why we couldn't get any gas sticker. He said the word had come through to him through the—* * *.

"A. I couldn't get the gas turned on, unless we paid the County [City] three thousand dollars.

"Q. Did you agree then? A. I was quite alarmed because it was getting cold, the people were moving in the apartments and they had to have gas for heat

and cooking, so I sent the three thousand dollars up and came back with a permit.

"Q. That was on October 29, 1962, is that right? A. That is right, and I also put on the back of the check that it was paid under protest, etc."

It is significant that the City Manager was in Court but was not called to contradict or rebut Mr. Gingery's testimony.

Judge (later Chief Judge) Prescott, for the Court, in *Montauk Corporation v. Seeds,* 215 Md. 491, 501, 138 A. 2d 907, 912 (1958) in discussing the doctrine of "business compulsion" (held not applicable in *Montauk*) stated the following:

"A succinct statement of the principle is contained in 79 A.L.R. 658, which briefs the opinion in *Illinois Merchants Tr. Co. v. Harvey* (Ill.), 167 N. E. 69, wherein it is said:

'The ancient doctrine of duress of person (later of goods) has been relaxed and extended so as to admit of compulsion of business and circumstances; and the rule deducible from the authorities is that where one, to prevent injury to his person, business, or property, is compelled to make payment of money which the party demanding has no right to receive, and no adequate opportunity is afforded the payer effectively to resist such payment, it is made under duress and can be recovered.' "

See *Beachlawn Bldg. Corp. v. City of St. Clair Shores,* 370 Mich. 128, 121 N. W. 2d 427 (1963) for a case applying the doctrine to an excess fee paid by builders to a municipality. See also *St. Louis Brewing Ass'n. v. City of St. Louis,* 140 Mo. 419, 37 S. W. 525 (1896), rehearing denied, 140 Mo. 419, 41 S. W. 911 (1897). 17 McQuillin, *Municipal Corporations* (3rd Ed.) sec. 49.63; 70 C.J.S. *Payment,* sec. 147; cf. *Gordon v. Village of Wayne,* 370 Mich. 329, 121 N. W. 2d 823 (1963).

I would affirm the Chancellor's decree.

I am authorized to state that Judge Marbury concurs in the views herein expressed.